**FOX NEWS NETWORK, LLC, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF THE TREASURY, Defendant.**

No. 08 Civ. 11009(RJH)(FM).

United States District Court, S.D. New York.

Sept. 3, 2010.

---

Steven Glen Mintz, Terence William McCormick, Paul Ostensen, Mintz & Gold LLP, New York City, NY, for Plaintiff.

Carolina A. Fornos, Danna Drori, U.S. Attorney's Office, New York, NY, for Defendant.

### DECISION AND ORDER

FRANK MAAS, United States Magistrate Judge.

In this action under the Freedom of Information Act ("FOIA"), Plaintiff Fox News Network, LLC ("Fox") seeks agency records from the United States Department of the Treasury ("Treasury") related to the intervention of the federal government ("Government") two years ago to prevent the impending financial collapse of American Insurance Group ("AIG") and Citigroup, Inc. ("Citigroup" or "Citi"). Treasury provided over 10,000 pages of documents to Fox, but withheld all or portions of approximately 7,000 pages under applicable FOIA exemptions. The parties have cross-moved for summary judgment with respect to approximately 300 documents that Fox argues were improperly withheld. For the reasons detailed below and in Appendix A to this Decision and Order, both motions are granted in part and denied in part.

### I. *Factual and Procedural Background*

The documents sought by Fox relate to events arising out of the financial collapse of Citigroup and AIG in late 2008, and the Government's subsequent intervention.

#### A. *AIG Bailout*

On September 15, 2008, three rating agencies, Standard & Poor's, Moody's, and Fitch Ratings, downgraded AIG's debt substantially, thereby alerting the Government that AIG would require an immediate influx of money to fund its collateral obligations and avoid insolvency. (Mem. of L. in Opp'n to Def.'s Mot. for Summ. J. & in Supp. of Cross–Mot. (Docket No. 44) ("Fox Mem.") at 5). Thereafter, the Government determined that it would be best to prevent "further disruption to already fragile financial markets that would be caused by a disorderly failure of AIG." (Mem. of L. in Supp. of Treasury's Mot. for Summ. J. (Docket No. 39) ("Treasury Mem.") at 6). Accordingly, on September 16, 2008, the Federal Reserve Board ("FRB") authorized the New York Federal Reserve Bank ("NYFRB") to provide an "$85 billion credit facility" to AIG. (*Id.; Fox Mem. at 6).

On September 22, 2008, AIG and NYFRB entered into a credit agreement which was collateralized by all of the assets of AIG. (Treasury Mem. at 6; Fox Mem. at 6). The credit facility was intended to allow AIG to continue operating long enough to sell its assets and repay NYFRB. (Treasury Mem. at 6–7; Fox Mem. at 6). The agreement also established a trust pursuant to which Treasury received a 79.9% equity interest in AIG. (Fox Mem. at 6; Treasury Mem. at 7). The instrument formally establishing the trust was not executed until January 16, 2009, at which point NYFRB appointed three trustees in consultation with Treasury to administer the trust. (Treasury Mem. at 7).

On October 3, 2008, Congress enacted the Emergency Economic Stabilization Act ("EESA"), which authorized the Troubled Asset Relief Program ("TARP"). (Fox Mem. at 6; Treasury Mem. at 4); *see also* EESA, Pub.L. No. 110–343, 122 Stat. 3765 (2008). On October 14, 2008, after a competitive proposal process, Treasury retained the Bank of New York Mellon ("BONY") to act as the custodian of TARP funds "and to help Treasury with custodial, accounting, auction management and other infrastructure services needed to administer the complex portfolio of troubled as-

sets" that Treasury had purchased through TARP. (Decl. of Joseph J. Samarias, dated June 22, 2009 (Docket No. 23) ("First Samarias Decl."), ¶ 18) (quoting Oct. 14, 2008 press release, available at http://www.financialstability.gov/latest/hp1211.html (last visited Sept. 2, 2010)).

After AIG's financial position continued to deteriorate throughout October, Treasury began working with FRB and NYFRB in an effort to provide additional funds to AIG. (Treasury Mem. at 7). On November 10, 2008, FRB and Treasury announced the broad terms of an agreement with AIG whereby Treasury would purchase $40 billion of senior preferred AIG stock under the Systematically Significant Failing Institution Program ("SSFI"). (Fox Mem. at 7). This transaction was completed on November 25, 2008. (*Id.;* Treasury Mem. at 7).

## B. *Citigroup Bailout*

Citigroup received TARP funds on three separate occasions between October 2008 and January 2009. (Treasury Mem. at 9; First Samarias Decl. ¶ 30). On October 28, 2008, Treasury invested $25 billion in Citigroup through the Capital Purchase Program ("CPP"). (Treasury Mem. at 9). However, in November 2008, because Citigroup's "financial prospects and viability" were still cause for concern, Treasury began working closely with FRB, NYFRB, and the Federal Deposit Insurance Corporation ("FDIC") to address Citigroup's continuing woes. (*Id.*). On November 23, 2008, Treasury announced additional programs of investment in Citigroup. (*Id.*). On December 31, 2008, Treasury invested another $20 billion in Citigroup by purchasing perpetual preferred stock and warrants through the Targeted Investment Program ("TIP"). (*Id.*). Finally, on January 16, 2009, Treasury, FDIC, and NYFRB entered into loss sharing arrangements with Citigroup as part of the Asset Guarantee Program ("AGP") to "provide protection against the possibility of Citigroup's suffering large losses on an asset pool of approximately $301 billion of primarily mortgage-related assets." (*Id.*).

## C. *Consultants*

In addition to working with NYFRB, Treasury enlisted the assistance of several outside consultants. On October 10, 2008, Treasury retained Simpson Thacher & Bartlett ("STB") as its legal counsel in connection with the Citigroup transactions (*Id.* at 10) and on November 4, 2008, it retained the Davis Polk & Wardwell LLP law firm ("DPW") as its legal counsel with respect to the AIG transaction. (*Id.* at 8, 10). On December 18, 2008, Treasury retained Pricewaterhouse Coopers ("PwC") to assist it with the AIG transaction. (*Id.* at 8).

Treasury also worked closely with NYFRB's outside consultants. On September 16, 2008, NYFRB retained DPW to provide legal advice with respect to the AIG transaction. (Treasury Mem. at 7 n. 3). On September 19, 2008, NYFRB retained the Ernst & Young accounting firm ("E & Y") to assist it in conducting due diligence on the AIG transaction. (*Id.*). On October 16, 2008, NYFRB retained Morgan Stanley & Co., Inc. ("Morgan Stanley") as its financial advisor. (*Id.* at 7 n. 3). NYFRB retained the Cleary Gottlieb Steen & Hamilton LLP law firm ("Cleary") to represent it in connection with future Citigroup transactions on November 25, 2008. (*Id.* at 10 n. 4).

Finally, Treasury also worked with the FDIC and the Sutherland, Asbill & Brennan, LLP firm, which the FDIC had retained to represent it with respect to the Citigroup transactions. (*Id.*).

## D. *Fox FOIA Requests*

Fox sent Treasury two FOIA requests. The first, dated November 25, 2008 ("No-

vember Request"), sought documents concerning BONY and AIG generated after July 1, 2008. (*Id.* at 3). The first six items in that Request sought the disclosure of an unredacted copy of Treasury's custodian agreement with BONY, as well as records related to the compensation paid to BONY pursuant to that agreement, and any records relating to actions either BONY or Treasury took in connection with BONY's obligations under the agreement. (*See* Decl. of Paul Ostensen, dated Aug. 7, 2009 (Docket No. 45) ("Ostensen Decl."), Ex. 1). The remaining ten items sought records "relating to funds paid to and assets acquired from AIG pursuant to TARP, as well as records pertaining to the terms of any TARP-related transactions with AIG, including executive compensation, oversight procedures, and pledged collateral." (Fox Mem. at 10).

The second request, dated December 1, 2008 ("December Request"), sought records concerning any data collected regarding the effect of TARP funds on the availability of credit for consumers and small businesses, documents generated after September 1, 2008 concerning the Citigroup TARP transactions, and any documents submitted by Citigroup "in connection with Citigroup's request for assistance pursuant to TARP." (Ostensen Decl. Ex. 2; Treasury Mem. at 4). The Request also sought any records related to agreements entered into between Treasury and Citigroup, including records concerning the terms, conditions, obligations, and restrictions of those agreements. (Ostensen Decl. Ex. 2; Treasury Mem. at 4).

Fox sought expedited processing of both requests pursuant to 5 U.S.C. § 552(a)(6)(E). (Fox Mem. at 10; Ostensen Decl. Exs. 1–2). When Treasury failed to respond to Fox's request for expedited processing within the statutory period, Fox commenced this action on December 18, 2008, and sought a preliminary injunction a few days later. (Fox Mem. at 10). On February 19, 2009, Judge Holwell directed Treasury to comply with Fox's FOIA request within thirty days and to provide a *Vaughn* index [1] within forty-five days. (*See* Order dated Feb. 19, 2009) (Docket No. 15).

Between February and April 2009, Treasury produced 10,113 pages of materials to Fox in response to its requests. (Treasury Mem. at 13). Of those pages, approximately 4,000 were partially redacted pursuant to various FOIA exemptions. Treasury also withheld in full 3,358 pages of documents. (*Id.*). In April 2009, Treasury provided an initial 334-page *Vaughn* index to Fox. (*Id.*). After a meet-and-confer required by Judge Holwell, Fox provided to Treasury on May 29, 2009, a list of approximately 300 documents still in dispute. (*Id.*).

### E. Cross–Motions for Summary Judgment

On June 22, 2009, Treasury filed a motion for summary judgment concerning the remaining disputed documents. (*See* Docket No. 22). Fox then cross-moved for summary judgment on August 7, 2009. (*See* Docket No. 43). Treasury filed its opposition papers on September 8, 2009,

---

[1]. In *Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C.Cir.1973), the Court of Appeals for the District of Columbia Circuit concluded that the government could meet its obligations under FOIA by submitting an index containing detailed descriptions of any documents redacted or withheld. In doing so, the court relied on the Supreme Court's suggestion in *Environmental Protection Agency v. Mink*, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), that *in camera* review is not necessary in every instance. *See id.* at 93, 93 S.Ct. 827 ("Plainly, in some situations, *in camera* inspection will be necessary and appropriate. But it need not be automatic.") (emphasis added).

and Fox filed its opposition papers on September 18, 2009. (*See* Docket Nos. 48, 52). Judge Holwell then referred the cross-motions to me for a Report and Recommendation on November 3, 2009. (*See* Docket No. 55). The parties subsequently consented to my jurisdiction to decide the cross-motions on March 26, 2010. (*See* Docket No. 64).

In its summary judgment motion, Fox challenges the adequacy of Treasury's search for responsive documents, as well as the withholding of specific documents under 5 U.S.C. §§ 552(b)(4) ("Exemption 4") and 552(b)(5) ("Exemption 5"). Exemption 4 relates to confidential information an agency has obtained from outside persons; Exemption 5 covers discovery privileges that would be available to an agency in litigation. Although Treasury also has withheld documents under 5 U.S.C. §§ 552(b)(2) ("Exemption 2"), which relates to internal agency administrative practices, and 552(b)(6) ("Exemption 6"), which relates to the privacy of confidential personal information, Fox has indicated that it does not challenge Treasury's reliance on these exemptions. (*See* Tr. of Mar. 19, 2010 Conf. (Docket No. 66) ("3/19/10 Tr.") at 2–3).

On December 4, 2009, I directed Treasury to supplement its *Vaughn* index with additional descriptions and to explain its failure to use the search term "BONY" in all of the offices it searched. (*See* Docket No. 57) ("Dec. 4 Order"). On December 11, 2009, Treasury submitted a letter describing its additional searches using the search term "BONY," (Letter to the Court from Ass't U.S. Att'y Danna Drori, dated Dec. 11, 2009 ("Drori Letter")), and it then timely filed its revised *Vaughn* index on January 22, 2010, *see* Decl. of Joseph J. Samarias, dated Jan. 22, 2010 (Docket No. 59) ("Fourth Samarias Decl."), Ex. A ("Revised *Vaughn* Index"). Thereafter, on February 16, 2010, Fox submitted a supplemental memorandum of law in response to the Revised *Vaughn* Index. (*See* Docket No. 63).

On March 19, 2010, I held oral argument on both motions, (*see* 3/19/10 Tr.), directing on March 26, 2010, that the parties provide the Court with redacted copies of the disputed documents listed in the Revised *Vaughn* Index provided to Fox. (*See* Docket No. 65). On July 12 and 26, as well as August 30, 2010, I further ordered Treasury to provide to the Court for *in camera* review fifty-two documents for which the descriptions in the Revised *Vaughn* Index were insufficient. Treasury timely provided those documents.

## II. *FOIA*

Through its passage of FOIA, Congress endorsed "a general philosophy of full agency disclosure." *Dep't of Air Force v. Rose,* 425 U.S. 352, 360, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976) (quoting S.Rep. No. 813, 89th Cong., 1st Sess., 3 (1965)). "[FOIA] seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands." *Mink,* 410 U.S. at 80, 93 S.Ct. 827. Under the statute, agencies must disclose their records upon request unless they can show that the requested records fall within nine enumerated exemptions. *See* 5 U.S.C. § 552(b) (listing exemptions); *Mink,* 410 U.S. at 79, 93 S.Ct. 827. The exemptions are "explicitly made exclusive." *Mink,* 410 U.S. at 79, 93 S.Ct. 827. Citizens may file a challenge to an agency's response to a FOIA request in a district court, which "shall determine the matter de novo [with] the burden ... on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B).

██ Summary judgment is the preferred vehicle for resolving FOIA cases.

"In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." *Carney v. U.S. Dep't of Justice,* 19 F.3d 807, 812 (2d Cir.1994). The agency can meet this burden through affidavits and declarations "giving reasonably detailed explanations why any withheld documents fall within an exemption." *Id.* Typically the agency will submit a *Vaughn* index containing descriptions of the withheld documents, along with affidavits or declarations from relevant officials. If the agency's submissions are adequate on their face, the district court may "forgo discovery and award summary judgment" to the agency, unless the plaintiff makes a showing of bad faith sufficient to impugn the agency's declarations, provides tangible evidence that an exemption claimed should not apply, or establishes that summary judgment is otherwise inappropriate. *Id.* (quoting *Goland v. CIA,* 607 F.2d 339, 352 (D.C.Cir.1978)).

■ In resolving a summary judgment motion in a FOIA case, a court must construe the statute broadly in favor of public disclosure and must construe the exemptions narrowly. *See U.S. Dep't of Justice v. Julian,* 486 U.S. 1, 8, 108 S.Ct. 1606, 100 L.Ed.2d 1 (1988); *Grand Cent. P'ship, Inc. v. Cuomo,* 166 F.3d 473, 478 (2d Cir.1999). In keeping with FOIA's goal of full disclosure, all doubts should be resolved in favor of disclosure. *See Grand Cent. P'ship,* 166 F.3d at 478.

## III. *Adequacy of Search*

Fox contends that Treasury's search for documents responsive to the FOIA requests was inadequate in several respects. Accordingly, I will address this issue before turning to the exemptions Treasury has claimed.

### A. *Search Terms*

■ Fox contends that Treasury erred by not using the terms "TARP" or "BONY" as part of its electronic search of certain offices within Treasury, and it questions Treasury's use of different search terms in different offices. (Reply Mem. of L. in Further Supp. of Pl.'s Cross–Mot. for Summ. J. (Docket No. 52) ("Fox Reply Mem.") at 2). Treasury responds that the use of different search terms took into account "the different functions of the offices" and therefore was proper. (Mem. of L. in Further Supp. of Treasury's Mot. for Summ. J. (Docket No. 48) ("Treasury Reply Mem.") at 10).

■ "[W]hen a plaintiff questions the adequacy of the search an agency made in order to satisfy its FOIA request, the factual question it raises is whether the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant." *Grand Cent. P'ship,* 166 F.3d at 489 (quoting *SafeCard Servs., Inc. v. SEC,* 926 F.2d 1197, 1201 (D.C.Cir.1991)). Thus, the question is not whether Treasury's search was perfect, but whether Fox has identified any flaws that would reveal that Treasury's search was not "reasonable." *See id.; Weisberg v. U.S. Dep't of Justice,* 745 F.2d 1476, 1485 (D.C.Cir.1984) ("The adequacy of the search, in turn, is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case."). I am satisfied that Treasury's search was adequate and that its search terms were appropriate.

Treasury employs a "decentralized method" of processing FOIA requests. (Decl. of Hugh Gilmore, dated June 17, 2009 (Docket No. 24) ("Gilmore Decl."), ¶ 10). FOIA requests seeking documents from the "Departmental Offices" bureau of Treasury—such as the requests at issue here—are processed through a sub-office

known as "Disclosure Services." (*Id.* ¶¶ 1, 10). Disclosure Services reviews each request and refers it to the relevant offices within Treasury, which then individually review the request and gather responsive materials. (*Id.* ¶ 10). For this reason, the search terms and protocol used in one office may not be the same as those used in another office.

Disclosure Services referred the Fox requests to five offices: the Office of Financial Stability ("OFS"), the Executive Secretary's Office ("OES"), the Office of Legislative Affairs ("OLA"), the Office of the General Counsel ("OGC"), and the Office of Public Affairs ("OPA").[2] (*Id.* ¶ 11). Treasury has submitted additional detailed affidavits from the FOIA coordinators for each of these five offices. (*See* Docket Nos. 25–29).

■ Although, Fox questions why Treasury's search terms varied from office to office, there is no requirement that an agency use identical search terms in all of its offices. For each office, Treasury has explained how the particular search terms were selected to target that office's involvement with AIG, Citigroup, and TARP. For example, OLA searched primarily for documents concerning EESA, as its involvement was primarily related to the passage of EESA. (*See* Decl. of Gail V. Harris–Berry, dated June 11, 2009 (Docket No. 26) ("Harris–Berry Decl."), ¶¶ 7–8). Treasury's explanation of why its search terms varied is reasonable. Indeed, there is no reason to believe a search conducted with uniform search terms across its offices would have yielded a greater number of responsive documents. (*See* Treasury Mem. at 10) (noting that identical search terms would not have accounted for the different functions of each office).

Fox's argument with respect to Treasury's failure to use the search term "BONY" is largely moot in light of Treasury's second search. The Dec. 4 Order directed Treasury to justify its failure to search for documents containing the term "BONY" by December 11, 2009, failing which it would be required to conduct such a search. (Dec. 4 Order at 2–3). On December 11, 2009, counsel for Treasury informed the Court that, while Treasury continued to disagree that its earlier search was inadequate, it had searched OES, OLA, and OPA for documents containing the term "BONY." (*See* Drori Letter at 3). These searches yielded only seven additional documents, which were released to Fox with limited redactions that Fox has not challenged. (*See id.* at 1).

■ There was no need to conduct a further search at OFS because it had used the search term "BONY" initially. (*See id.* at 2). OGC also did not conduct a further search because its staff members performed their own individualized searches for responsive documents, and thus did not conduct a centralized electronic search using keywords as the predicate to any of its production. (*Id.*). Although Fox continues to object to the individualized searches conducted by OGC, FOIA does not require an office to use electronic search terms, nor has Fox pointed to any case law imposing such a duty on an agency. In the absence of any such duty, or a showing that the individualized searches were somehow defective, I find that the procedure employed by OGC was "reasonably calculated" to find all responsive documents. *See Grand Cent. P'ship,* 166 F.3d at 489.

---

**2.** Fox initially objected to Treasury's choice of offices, but since has conceded that it is satisfied with Treasury's selection of these five offices. (*See* Fox Reply Mem. at 3–4) (accepting Treasury's explanation for not searching the Office of Procurement Services).

In sum, Treasury has shown that its search for documents concerning the Bank of New York Mellon using the term "BONY" was sufficient.

Turning to the request to search using the term "TARP," Treasury explains that the use of this term would make little sense in OFS, which Congress specifically created to implement and manage TARP and whose documents all presumably relate to TARP. (Treasury Reply Mem. at 10). Treasury also notes that searching its records "using the names of [the] entities, in lieu of 'TARP,' reasonably could be expected to encompass all documents related to Treasury's investments in AIG and Citigroup as well as Treasury's contract with BONY." (*Id.*). Accordingly, OES and OPA did not utilize the term "TARP" when searching for records responsive to the November Request because the items sought did not relate to TARP generally, but, rather, to BONY and AIG. (*See* Decl. of Michelle Ayers, dated June 17, 2009 (Docket No. 25) ("Ayers Decl."), ¶ 7; Decl. of Rowena Holloway, dated June 18, 2009 (Docket No. 27) ("Holloway Decl."), ¶ 6). However, both offices used the search term "TARP" in response to the December Request, which sought documents relating to TARP administration. (Ayers Decl. ¶ 9; Holloway Decl. ¶ 6).

OLA did not use the search term "TARP," but searched for documents related to the "Emergency Economic Stabilization Act of 2008" and "H.R. 1424," which presumably would cover OLA's involvement with TARP in its role as the Congressional liaison office. (*See* Harris–Berry Decl. ¶¶ 7–8). And, as noted previously, OGC did not do a centralized search, but rather had individual employees search their email and documents, and thus relies on these individuals' representations that they produced all responsive documents. (*See* Decl. of Brett M. Kitt, dated June 22, 2009 (Docket No. 28), ¶ 5).

Although Treasury's search admittedly may not have been perfect, the declarations submitted by each of the five offices adequately describe a search that was reasonably calculated to find responsive documents. *See Weisberg,* 745 F.2d at 1485 ("In demonstrating the adequacy of the search, the agency may rely upon reasonably detailed, nonconclusory affidavits submitted in good faith."). Moreover, Treasury has provided logical explanations for each of the decisions it made as to the search terms to be used and how to conduct the searches. Accordingly, I find that the scope of Treasury's search in each of the five offices was reasonable.

### B. *BONY Custodianship Documents*

█ Fox also has expressed concern about Treasury's failure to produce any documents relating to BONY's performance of its custodian agreement with Treasury. (*See* Fox Reply Mem. at 3). Specifically, Fox points to Items 3 through 5 of its November Request, which sought records related to the compensation that Treasury paid to BONY and to actions undertaken by either Treasury or BONY in connection with their duties and obligations under the custodian agreement. (*See* Ostensen Decl. Ex. 1 ¶¶ 3–5).

Treasury responds with respect to Item 3 that it produced an unredacted version of the custodian agreement with BONY, which details the compensation to be paid by Treasury to BONY. (Treasury Reply Mem. at 6). Treasury further notes that it did not produce any documents relating to compensation actually paid to BONY because Treasury "made no payments to BONY until after it received BONY's first invoice on February 19, 2009, which postdated the commencement of searches for responsive documents." (*Id.*). Fox counters that Treasury should not be relieved of the obligation to produce a responsive

document of which it is aware simply because the document postdates the commencement of the search. (Fox Mem. at 3 & n. 2).

As to Items 4 and 5, Treasury contends that it in fact has produced responsive documents, including "communications between Treasury and BONY relaying wiring instructions and bank routing information used to facilitate certain TARP transactions, describing the process by which Treasury wires money among its internal accounts, and authorizing and directing the transfer of TARP funds." (Treasury Mem. at 7). Treasury further contends that it has adequately searched for responsive documents. Specifically, Treasury searched the records of Gary Grippo, Deputy Assistant Secretary for Fiscal Operations, who was responsible for managing the application process through which BONY was selected and for "the ongoing supervision of the financial agency agreement" between Treasury and BONY. (*Id.* at 6–7). Ellen Neubauer, the Executive Secretary of OFS during the relevant time period, states in her declaration that Treasury provided "all letters, agreements, certifications, approvals, instructions and other documents pertaining to Treasury's financial agency agreement with [BONY]" from a folder on Mr. Grippo's computer. (Decl. of Ellen Neubauer, dated June 18, 2009 (Docket No. 29) ("Neubauer Decl."), ¶ 8). She further states that, because of the role Mr. Grippo played in supervising the BONY agreement, it is unlikely there are any non-duplicative records responsive to those items located anywhere else within OFS. (*Id.*).

■■■ Fox has failed to point to any evidence that Treasury missed any documents related to BONY in its search. "Mere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them." *SafeCard,* 926 F.2d at 1201. Accordingly, I find that Treasury's search for BONY-related items was adequate.

■■■ Although records of payments from Treasury to BONY were created after the commencement of Treasury's search for responsive documents, Fox cites to no authority suggesting that FOIA requires Treasury to produce a document post-dating the commencement of the search of which it became aware while the search was underway. Such a rule would be unwieldy, as it would require the Court to ask, in the first instance, who in the agency might have been aware of the existence of a document in order to determine whether the agency's duty to provide the document would be triggered by a FOIA request. Moreover, utilizing the date the search commences as a cut-off date does not unduly prejudice the requesting party, because it may easily file a follow-up request for documents created after the date the search commenced. For reasons such as these, courts have consistently held that an agency may limit its FOIA search to records created on or before the date of the commencement of the search. *See Edmonds Inst. v. U.S. Dep't of Interior,* 383 F.Supp.2d 105, 111 (D.D.C.2005) (start of search as cut-off date is reasonable); *Defenders of Wildlife v. U.S. Dep't of Interior,* 314 F.Supp.2d 1, 12 n. 10 (D.D.C.2004) (same); *see also McGehee v. C.I.A.,* 697 F.2d 1095, 1102–05 (D.C.Cir.1983) (discussing reasonableness of cut-off dates in general); *Physicians for Human Rights v. U.S. Dep't of Def.,* 675 F.Supp.2d 149, 164 (D.D.C.2009) (citing *Edmonds* with approval).

C. *Item 15 of November Request*

■■■ Finally, Fox questions the fact that Treasury "has not disclosed any of the ... items AIG was required to report to

Treasury, such as those identified in *Section 3.5* of the AIG Securities Purchase Agreement...." (Fox Reply Mem. at 3) (emphasis in original). That section requires AIG periodically to certify its compliance with EESA. (*Id.* at n. 3). Fox contends that such certifications are responsive to Item 15 of the November Request, which seeks records "relating to an[y] accountings that have been given by AIG in connection with the implementation of TARP, [EESA] and/or H.R. 1424." (Ostensen Decl., Ex. 1 ¶ 15). Fox also notes that Treasury did not provide "the list of AIG's counterparties and swap positions that had led it to request assistance from Treasury in the first place." (Fox Reply Mem. at 3).

Treasury counters that it has not provided these documents because AIG's own accounting is publicly available. (Treasury Reply Mem. at 8). Moreover, Treasury argues that it produced information "demonstrating that it received confirmation from NYFRB that the $40 billion was used to repay AIG's debt to NYFRB." (*Id.*). Treasury supplemented its response in a letter to Judge Holwell, in which it noted that AIG did not begin providing the information required by Section 3.5 of the Securities Purchase Agreement until March 2009, "well after its search for responsive documents had commenced." (Letter to Judge Holwell from Danna Drori, Ass't U.S. Att'y, dated Sept. 24, 2009, at 1). As to the counterparties and swap positions, Treasury stated in the letter that it provided "the non-exempt portions of responsive documents that it was able to locate in its files regarding the AIG counterparties and swap positions." (*Id.* at 2).

As with the BONY documents, there is no reason to doubt Treasury's assurance that it has searched for and provided all documents relevant to Item 15 of the November Request.

## IV. *Preliminary Observations*

Before turning to a discussion of specific documents or groups of documents, a few words are in order regarding the approach I have taken in addressing the FOIA exemptions claimed and the nomenclature I have used.

First, throughout this Decision and Order, the document numbers used refer to the document numbers in the Revised *Vaughn* Index. Document numbers that begin with a "W" originally were withheld in full, although Treasury has since made "discretionary releases" of portions of some of these documents.

Additionally, unless otherwise specified, any document descriptions in quotes are taken from the corresponding entry in the Revised *Vaughn* Index. Citations to "Document—," on the other hand, refer to the actual text of the documents.

In some instances, Treasury has withheld different portions of a single document (for example, different emails in an email thread) on the basis of different exemptions or privileges. To account for this, I have indicated that the "portion" was (or was not) properly withheld. At times, the redacted documents indicate that Treasury relies on Exemption 5 although the Revised *Vaughn* Index cites Exemption 4. Where such conflicts appear, I have treated Treasury's Revised *Vaughn* Index as controlling (unless otherwise noted).

Finally, there are instances in which Treasury has withheld some or all of a single document on the basis of multiple exemptions or privileges. If necessary, I have addressed the same document multiple times. However, if the document or a portion thereof was properly withheld under one exemption or privilege, it has not been considered in the discussion of other potentially applicable exceptions or privileges.

## V. *Exemption 5*

■■■ Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party ... in litigation with the agency." 5 U.S.C. § 552(b)(5). "To qualify, a document must thus satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Dep't of Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. 1, 8, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001). By incorporating the second requirement, Congress evinced its intention that Exemption 5 be coterminous with traditional discovery privileges.

Citing Exemption 5, Treasury has withheld documents pursuant to the attorney-client, deliberative process, and executive privileges. The 210 documents withheld under Exemption 5 constitute the bulk of the disputed documents in this case. Fox does not challenge the withholding of documents under the "executive privilege."[3] The applicability of the other two privileges will be considered below. Prior to considering whether the documents at issue have been properly withheld as privileged, however, the Court must resolve whether the source of the documents is an agency, such that they constitute "inter-agency" or "intra-agency" documents.

### A. *Intra- or Inter–Agency Requirement*

The documents withheld under Exemption 5 were exchanged between or among Treasury, the White House, FRB, the FDIC, NYFRB, Morgan Stanley, PwC, E & Y, and several law firms. Of these, Fox only challenges whether the documents exchanged between or among Treasury and NYFRB, Morgan Stanley, PwC, and E & Y can properly be considered "intra-agency." (Fox Mem. at 19–21). Treasury contends that all of these documents were properly withheld pursuant to the so-called "consultant corollary" to the definition of "intra-agency." (Treasury Mem. at 21–24). More specifically, Treasury claims that PwC, E & Y, Cleary, and Morgan Stanley are consultants to NYFRB, which, in turn, serves as a consultant to Treasury. (*Id.*).

■■■ "The question at issue regarding the intra- or inter-agency requirement is whether the document either originated from or was provided to an entity that is not a federal government agency, in which case the document is not protected by the exemption." *Tigue v. U.S. Dep't of Justice,* 312 F.3d 70, 77 (2d Cir.2002). In 1971, the District of Columbia Circuit recognized the "consultant corollary" to the intra-agency definition, which treats documents exchanged with agency consultants as intra-agency for purposes of Exemption 5. *See Soucie v. David,* 448 F.2d 1067, 1078 n. 44 (D.C.Cir.1971). It subsequently expanded the application of this corollary beyond the context of paid consultants in a line of cases beginning with *Ryan v. Dep't of Justice,* 617 F.2d 781 (D.C.Cir.1980).

In *Ryan,* the D.C. Circuit concluded that questionnaire responses that United States Senators had submitted to the Department of Justice ("DOJ") to enable the Attorney General to monitor compliance with President Carter's merit selection guidelines for federal judges were agency records for FOIA purposes, even though the Senators were not "agencies" within the meaning of FOIA. *Id.* at 784, 789. As the court explained, "an agency often needs to rely on

---

**3.** Treasury withholds Documents W 1051–1054 and W 1856 under the executive privilege.

the opinions and recommendations of temporary consultants, as well as its own employees." *Id.* at 789. Accordingly, "[w]hen an agency record is submitted by outside consultants as part of the deliberative process, and it was solicited by the agency, . . . [it is] reasonable to deem the resulting document to be an 'intra-agency' memorandum for purposes of determining the applicability of Exemption 5." *Id.* at 790. The court reasoned that the questionnaires plus responses were the functional equivalent of such consultant submissions. *Id.*

In later cases, the D.C. Circuit has adhered to its expansive view of the intra- or inter-agency requirement in varying contexts. *See, e.g., Nat'l Inst. of Military Justice v. U.S. Dep't of Def.,* 512 F.3d 677, 682 (D.C.Cir.2008) (opinions and recommendations solicited by the Department of Defense from non-governmental attorneys are intra-agency records); *Formaldehyde Inst. v. Dep't of Health & Human Servs.,* 889 F.2d 1118, 1123–25 (D.C.Cir.1989) (peer-review comments regarding a scientific journal submission are intra-agency records). In contrast, although the Second Circuit accepted the *Soucie* "consultant corollary" to Exemption 5 in *Lead Industries Association, Inc. v. Occupational Safety and Health Administration,* 610 F.2d 70, 83 (1979) (citing *Soucie,* 448 F.2d at 1078 n. 44), it has never endorsed the broader *Ryan* line of cases, which would exempt the NYFRB records from disclosure even though NYFRB was not a disinterested consultant to Treasury.

In the absence of clear authority in this Circuit, both sides focus their arguments on *Klamath.* In that case, the Supreme Court noted that

consultants whose communications have typically been held exempt have not been communicating with the Government in their own interest or on behalf of any person or group whose interests might be affected by the Government action addressed by the consultant. In that regard, consultants may be enough like the agency's own personnel to justify calling their communications "intra-agency."

*Klamath,* 532 U.S. at 12, 121 S.Ct. 1060.

Significantly, a footnote at the end of this paragraph observed that

Courts of Appeals have recognized at least two instances of intra-agency consultants that arguably extend beyond what we have characterized as the typical examples. [Citing, inter alia, *Ryan* ]. We need not decide whether either instance should be recognized as intra-agency, even if communications with paid consultants are ultimately so treated. As explained above, the *intra-agency condition excludes, at the least, communications to or from an interested party seeking a Government benefit at the expense of other applicants.*

*Id.* at 12 n. 4, 121 S.Ct. 1060 (emphasis added).

Seizing on this latter language, Fox argues that NYFRB was not "brought in to carry out functions of [Treasury,] which is the essence of a consultant's services to an agency," but rather to serve its own interests as a secured lender to AIG. (Fox Mem. at 20). It is, of course, clear that NYFRB had an "interest" in the AIG transaction that differed from Treasury's interest. Specifically, Treasury used TARP funds to retire AIG's debt to NYFRB, incurred when NYFRB extended its loan in September 2008 before Congress passed EESA.[4] Treasury contends

4. Fox also contends that NYFRB had an independent interest in the Citigroup transaction because it agreed to provide financing to Citigroup apart from Treasury's investment. (Fox Mem. at 20). What distinguishes the AIG transaction is that NYFRB *received* TARP

argues that this type of "interest" is not what the Supreme Court had in mind, because NYFRB is a federal institution that does not actually compete in the marketplace. (*See* 3/19/10 Tr. at 31).

■ Notwithstanding Fox's contentions, it is clear that NYFRB functioned "enough like" Treasury's own personnel during these transactions "to justify calling their communications 'intra-agency.'" *Klamath*, 532 U.S. at 12, 121 S.Ct. 1060. NYFRB and Treasury worked side-by-side in developing the terms of these transactions, and I have no reason to doubt their representations that the fundamental concern of both entities was stabilizing the economy. Since they clearly were on the same team, I find that their communications were "intra-agency" communications within the meaning of Exemption 5.[5]

■ PwC, E & Y, and Morgan Stanley, in turn, functioned as consultants in the more traditional sense; indeed, Fox does not seriously challenge their status as consultants to NYFRB. As the Second Circuit noted in *Tigue*, communications between an agency's consultant and a consultant to a consultant may be considered "intra-agency" for purposes of Exemption 5. *See Tigue*, 312 F.3d at 80 (exempting communications between a commission formed to provide guidance to an agency and the commission's consultants). Thus,

Treasury also is entitled to claim that these sub-consultant's communications fall within Exemption 5.

For these reasons, Treasury properly withheld as "intra-" or "inter-agency" all but two of the documents for which it relies on Exemption 5.

■ The two exceptions, documents W2719 and 8972–8983, dated November 10, 2008, are email threads "discuss[ing] the proposed mechanics of how Treasury will fund the $40 billion purchase of senior preferred stock in AIG." As part of the email thread at 8972–8983, a Treasury employee forwarded an email from an NYFRB staff member with the subject line "IMPORTANT FW: AIG FUNDING" and the text: "See below a question about funding for AIG.... It seems they need an answer today." (*See* Document 8981).

The unredacted documents show that it was NYFRB that required an answer, not AIG. In fact, in these emails NYFRB is stating a preference for how an aspect of the transaction—specifically, the transfer of funds to NYFRB—should be conducted. Thus, in this instance NYFRB was not acting as a consultant, but, rather, was functioning as a party to the transaction negotiating with Treasury. Accordingly, the email from NYFRB to Treasury at the top of W2719 (repeated at the bottom of

---

funds in satisfaction of AIG's indebtedness to NYFRB. NYFRB's willingness to contribute its own funds to Citigroup only emphasizes that its interest in preventing Citigroup's collapse and Treasury's interest were identical.

**5.** If NYFRB were a federal agency, its communications would be considered interagency even if its employees were representing separate interests or taking policy positions different than those of Treasury's employees. Indeed, the interests of various agencies often diverge based on their different areas of responsibility and expertise. Both Treasury and the FRB, however, have consistently maintained that NYFRB is *not* an agency for

FOIA purposes. *See Bloomberg L.P. v. Bd. of Governors of Fed. Reserve Sys.*, 649 F.Supp.2d 262, 277 n. 12 (S.D.N.Y.2009), *aff'd*, 601 F.3d 143 (2d Cir.2010) (declining to resolve whether NYFRB is an agency). Fox has argued under Exemption 5 that NYFRB is not an agency, and under Exemption 4 that it is an agency. (Fox Mem. at 21, 29) Although it obviously would be strange to consider NYFRB an agency for purposes of one exemption and not for another, it is unnecessary to reach this question in this case because, even if it is not an agency, NYFRB is properly considered a consultant to Treasury, to which the consultant corollary to Exemption 5 applies.

8979 and bottom of 8982) must be released.[6]

## B. *Deliberative Process Privilege*

 Treasury has withheld all or some of 197 intra- or inter-agency documents pursuant to the deliberative process privilege. The deliberative process privilege applies to materials that are part and parcel of the process of internal agency decisionmaking. *See N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975) (protects documents comprising part of a process by which policies are formulated). The main purpose of this privilege is to promote better policymaking by encouraging candor in internal deliberations; thus it typically protects memoranda, drafts, recommendations, proposals, and other documents that reflect the opinions of their authors, rather than those of the agency. *See Tigue*, 312 F.3d at 76 (opinions, recommendations, and deliberations); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C.Cir.1980) ("recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer"). However, in order to be covered under the deliberative process exception, a document must not only be inter- or intra-agency, but also both "predecisional" and "deliberative." *Grand Cent. P'ship*, 166 F.3d at 482.

 " 'A document is predecisional when it is prepared in order to assist an agency decisionmaker in arriving at his decision.' " *Tigue*, 312 F.3d at 80 (internal quotation marks omitted) (quoting *Grand Cent. P'ship*, 166 F.3d at 482). Although an agency need not "pinpoint" an exact decision made in reliance on the document, it must show, ex ante, that the document "related to a specific decision facing the agency." *Id.* This test is designed to distinguish predecisional documents from those that are "merely part of a routine and ongoing process of agency self-evaluation." *Id.* (internal quotation marks and citations omitted); cf. *E.B. v. N.Y.C. Bd. of Educ.*, 233 F.R.D. 289, 293 (E.D.N.Y.2005) (distinguishing "policy oriented judgments" from "routine operating decisions").

 To be deliberative, a document must actually be "related to the process by which policies are formulated." *Grand Cent. P'ship*, 166 F.3d at 482. Among the factors that courts have considered in this regard are whether the document forms an essential link in a specific consultative process, whether it reflects the personal opinion of the writer rather than the policy of the agency, and whether, if released, it would inaccurately reflect or prematurely disclose the views of the agency. *Id.* Thus, Treasury must actually identify and explain the role that a given document has played in the decisionmaking process. *See, e.g., Coastal States*, 617 F.2d at 868 ("agency has the burden of establishing what deliberative process is involved, and the role played by the documents in issue in the course of that process"). Because deliberative documents reflect the "give-and-take" of agency decisionmaking, *id.* at 866, factual material is not covered by the deliberative process privilege. *Mink*, 410 U.S. at 91, 93 S.Ct. 827. Purely factual material that is severable "without compromising the private remainder of the documents" consequently must be released. *Id.*

The documents withheld by Treasury pursuant to the deliberative process privi-

---

**6.** The remaining redactions in this email thread are in emails among Treasury staff and DPW and thus are properly considered intra-agency. The intra-agency portions of the email thread are considered below in connection with Treasury's assertion of the deliberative process privilege.

lege fall into several broad categories. Many of the documents are simply different versions of the same memo, letter, or email and therefore are properly considered together. My review of these groups of documents results in the conclusions set forth below as to whether the documents qualify for exemption under the deliberative process privilege.

### 1. *Transactional Documents*

 Many of the withheld documents are either internal drafts of transactional documents, such as asset purchase agreements or term sheets, or emails reflecting internal discussion about the terms of the AIG or Citigroup transactional documents. Although decisions about the terms of a financial transaction may not be typical of those made by a federal agency, the decisions that Treasury made regarding the use of TARP monies and the structure of the transactions with AIG and Citigroup clearly are policy decisions. Accordingly, any such documents created before the transactions were finalized are predecisional,[7] and, to the extent that they represent internal deliberation as to the appropriate terms of the transactions, are protected by the deliberative process privilege.[8]

Of course, transactional document drafts that eventually were shared with AIG or Citigroup are not exempt. Indeed, Treasury agrees and has represented that it did not claim deliberative process privilege for any such documents.[9] (*See* Decl. of Joseph J. Samarias, dated Sept. 4, 2009 (Docket No. 49) ("Second Samarias Decl."), at 18 n. 7). On the other hand, drafts circulated solely between or among agency personnel (and agency consultants) do potentially fall within this exemption.[10] This

---

7. The transactional documents reflect a series of staged decisions made by Treasury regarding the transactions with AIG and Citigroup. For example, Treasury and AIG finalized the basic terms of their transaction with the issuance of a press release on November 10, 2008. Treasury did not finalize its decisions about the details of that transaction, however, until shortly before the final agreements were executed on November 25, 2008.

8. Fox has challenged Treasury's claim that factual content within the transactional draft documents cannot be severed and produced. (*See* 3/19/10 Tr. at 7–8). The unredacted documents confirm, however, that there is no way to separate the factual material from the deliberative material. To the extent that the drafts contain language that did not exist in the final transactional documents, disclosure would reveal options that the agency did not select—which is precisely the sort of information that is protected by the deliberative process privilege. *See, e.g., Lead Indus. Ass'n,* 610 F.2d at 86 (improper to order disclosure of segments of a draft document because "[i]f the segment appeared in the final version, it is already on the public record and need not be disclosed. If the segment did not appear in the final version, its omission reveals an agency deliberative process.").

9. This representation is corroborated by the partially redacted documents turned over to Fox, which show that emails to AIG or Citigroup within email threads for which the deliberative process privilege otherwise was claimed typically were not redacted. There is one exception. Documents 8548–8550 and 8567–8569 contain multiple copies of a single email from a DPW attorney to a Treasury attorney that states: "Please see below a revision that was just sent to us by Anthony Valoroso at AIG." The remainder of the email, which provides an edit suggested by AIG, was redacted at the top of page 8548 (as well as elsewhere in the documents). Since Treasury cannot redact information received from AIG on the theory that it is protected by the deliberative process (or attorney-client) privilege, Treasury must provide an unredacted copy of this email to Fox.

10. The documents in this category are W34–W69, W455–W519, W1439–W1536, W1755–W1800, W3046–W3048, 1289–1303, 1567–1579, 1882–1895, 1914–1926, 1986–1999, 2013–2022, 2023–2033, 2128–2140, 2168–2180, 2196–2208, 2239–2287, 2290–2298, 2481–2527, 2599–2607, 2717, 2727, 2779–2793, 2850–3032, 8904–8916, 8917–8929, 8930–8933, 8934–8946, 8947–8959, 8960–

includes "redlines" or comparisons of two or more drafts, if at least one of the comparison drafts was not circulated to anyone other than Treasury personnel and Treasury consultants. In addition, portions of transactional documents—such as the executive compensation provisions of the term sheet—fall within this protection, even if they were pasted into the text of an internal email.

 Documents that are not drafts but reflect internal discussion as to the transaction terms similarly are covered by Exemption 5.[11] These documents include emails commenting on attached drafts, general discussions regarding provisions of the agreements, and discussions about changes that either have been or are to be made.

### 2. Talking Points, Press Releases, and Other Public Relations Materials

Fox argues that documents such as draft talking points and draft press releases are not exempt from disclosure under the deliberative process privilege. (Fox has identified 22 such documents). (Fox Mem. at 23 n. 16). Fox's argument has two prongs. First, Fox contends that these documents were meant to explain previously-made decisions and thus are post-decisional. (Fox Mem. at 23). In its response, Treasury alleges that at the time these remarks or press releases were prepared, the details of the AIG and Citigroup transactions had not been finalized, so

there were decisions remaining to be made. (Treasury Reply Mem. at 32–33). Second, Fox argues that even if the withheld material is predecisional, the deliberative decisions reflected in revisions to proposed remarks for a press conference are not substantive policy decisions, but, rather, decisions about how to present the agency's decisions to the press. (Fox Reply Mem. at 8). Whether an agency's discussions about how to package its views for presentation to the public should be covered by the deliberative process privilege is a subject that has yet to be addressed by either the District of Columbia or Second Circuit Courts of Appeal.

Two district judges in the Southern District of New York have held that such decisions are not covered by the deliberative process privilege. In *New York Times Co. v. United States Department of Defense*, 499 F.Supp.2d 501 (S.D.N.Y. 2007), Judge Berman concluded that "talking points and the formulation of responses to possible questions . . . prepared to aid in briefing officials and preparing them to answer . . . inquiries from the press" were neither predecisional nor deliberative. *Id.* at 515 (internal quotation marks omitted). Magistrate Judge Francis similarly noted in a non-FOIA case that "[w]hether or not the Mayor should use . . . suggested 'talking points' is not the sort of public policy decision that falls within the scope of the [deliberative process] privilege." *MacNamara v. City of*

8961, 9162–9243, 9300–9340, 9604–9612, 9698, 9971–9977, 9978, 10091–10093.

**11.** The documents in this category are W3050–W3053, W3070–W3073, W3077–W3082, W3085–W3092, portion of 1733–1740, 1912–1913, 1930–1931, 1932–1933, 2181–2182, 2209–2210, 2211–2212, 2213–2214, 2218–2220, 2221, 2222–2223, 2338–2350, 2354–2358, 2421–2436, 2451–2463, portion of 2527A–2542, 2546–2547, 2593–2594, 2616–2618, 2626–2627, a portion of

2794–2805, 8405, 8495–8497, 8540–8542, a portion of 8548–8550, a portion of 8567–8569, 8591–8593, 8596–8601, 8605–8608, 8615–8618, 8630–8635, 8687–8690, 8691–8693, 8726–8734, 8742–8746, 8791–8795, 8962–8964, 9064, 9065/9066–9067, 9244–9257, 9464–9487/9501–9505, 9525–9537/9542–9549, 9559–9575, 9585, 9587–9596, a portion of 9623–9625/9640–9644, 9647–9648, 9674–9683, 9699–9725, a portion of 9729–9739/9743–9745/9754–9756/9757–9763, 9795–9815, 9831–9834.

*New York,* No. 04 Civ. 9216(KMK)(JCF), 2007 WL 1169204, at *5 (S.D.N.Y. Apr. 20, 2007).

Both cases rely upon Second Circuit case law distinguishing "routine and ongoing" agency decisions from "policy-oriented" judgments, finding that only the latter are covered by the deliberative process privilege. *See Tigue,* 312 F.3d at 80; *see also E.B.,* 233 F.R.D. at 293; *Schiller v. City of New York,* No. 04 Civ. 7922(KMK)(JCF), 2007 WL 136149, at *10 (S.D.N.Y. Jan. 19, 2007); *MacNamara,* 2007 WL 1169204, at *5; *N.Y. Times Co.,* 499 F.Supp.2d at 515.

On the other hand, in *Thompson v. Department of the Navy,* No. Civ.A. 95–347 (RMU), 1997 WL 527344, at *4–*5 (D.D.C. Aug. 18, 1997), Judge Urbina was asked to consider whether documents prepared to assist senior Navy officials in responding to the media in the wake of the USS Iowa explosion were covered by the deliberative process privilege. Included among the documents were (a) a set of hypothetical questions to help an admiral prepare for a television interview; (b) a critique of the admiral's practice interview; (c) a draft answer to a possible media inquiry; and (d) a videotape of a mock press conference. *Id.* at *4. The court held that the Navy had established "that it was engaged in a predecisional, deliberative process concerning what information it was going to disclose to the media vis-a-vis the explosion aboard the USS Iowa." *Id.* at *5.[12]

Similarly, in *Sierra Club v. U.S. Department of Interior,* 384 F.Supp.2d 1, 22 (D.D.C.2004), Judge Collyer considered a "[d]raft compilation of arguments propounded by outside groups regarding [the Arctic National Wildlife Refuge

("ANWR") ], with preliminary responses from the Department." The agency asserted, and the court agreed, that the document "show[ed] the development of the Department's policy regarding how to present its positions on ANWR, and, as a draft, [was] predecisional to the Department's final positions." *Id.* at 22 (internal quotation marks and citation omitted).

Most recently, in *ICM Registry, LLC v. U.S. Department of Commerce,* 538 F.Supp.2d 130, 132 (D.D.C.2008), the plaintiff sought documents from the Commerce Department concerning its involvement in ICANN's rejection of a new .xxx internet domain. Those documents included an email thread in which "the redactions relate[d] to the opinions of Commerce employees on how to present Commerce's role in making changes to the authoritative root zone file to the public." *Id.* at 136. Judge Robertson rejected the plaintiff's argument that these were not deliberations on substantive agency policy, holding that "deliberations regarding public relations policy are deliberations about policy, even if they involve 'massaging' the agency's public image." *Id.*

In light of these conflicting decisions, it is appropriate to focus on the policy underlying the deliberative process privilege. As the Supreme Court has stated: "The point, plainly made in the Senate Report, is that the 'frank discussion of legal or policy matters' in writing might be inhibited if the discussion were made public; and that the 'decisions' and 'policies formulated' would be the poorer as a result." *Sears, Roebuck & Co.,* 421 U.S. at 150, 95 S.Ct. 1504 (quoting S.Rep. No. 813, p. 9). The key issue therefore is whether it is

---

**12.** Another Judge in the same district reached a seemingly contrary conclusion. *See Nat'l Sec. Archive v. F.B.I.,* 759 F.Supp. 872, 880–81 (D.D.C.1991) (Oberdorfer, J.) (briefing book developed for high-level FBI official to prepare him for testimony before House subcommittee not privileged because policy options were not considered in connection with the testimony).

necessary that deliberations concerning "massaging the agency's public image" be covered under the deliberative process privilege to further the goals of FOIA.

■ Communications regarding how to present agency policies to Congress, the press, or the public, while deliberative, typically do not relate to the type of substantive policy decisions Congress intended to enhance through frank discussion. Nevertheless, such documents are properly withheld if their release would reveal the status of internal deliberations on substantive policy matters. Here, Treasury claims privilege with respect to four categories of documents relating to press or public relations, each of which merits separate consideration.

### i. Draft Press Release and Accompanying Comments

■ Nine documents reflect discussions about, and revisions to, a single draft press release.[13] According to the Second Samarias Declaration:

> The draft press release was prepared in anticipation of the contemplated release of the AIG/SSFI term sheet, which was not finalized until November 10, 2008. The draft includes placeholders in anticipation of the Department's final decisions related to certain additional limitations, restrictions, and taxpayer protections to be made part of the AIG/SSFI transaction. The remaining documents are subsequent email threads (the latest of which is November 9, 2008), which attach further drafts of the draft release, suggest additional revisions in light of ensuing changes in the proposed terms, and of-

fer opinions and recommendations regarding anticipated press inquiries about the not-yet finalized transaction.

(Second Samarias Decl. ¶ 34(f)). The draft press releases were withheld in full; the email discussions were released in part.

Although opinions and recommendations regarding press inquiries do not qualify as deliberations about substantive policy decisions, disclosure of the various drafts of the press release at issue here would reveal how Treasury's deliberations with respect to the underlying substantive policy progressed over the course of several days. It would disclose, for example, alternatives that were not adopted and discussions regarding the rationale for provisions that were adopted which may not accurately reflect the ultimate rationale for their adoption. *See, e.g., Sears, Roebuck & Co.*, 421 U.S. at 152, 95 S.Ct. 1504 ("The public is only marginally concerned with reasons supporting a policy which an agency has rejected, or with reasons which might have supplied, but did not supply, the basis for a policy which was actually adopted on a different ground."); *Coastal States*, 617 F.2d at 866 ("The privilege has a number of purposes: it serves ... to protect against premature disclosure of proposed policies before they have been finally formulated or adopted[ ] and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.").

Accordingly, the draft press release and emails related thereto were properly with-

---

**13.** These documents are 2704–2706, 2728–2730, 8698–8701, 8704–8706, 8714–8717, 8781–8784, 8825–8826, 8829–8830, and 8861–8864. The final press release, captioned "Treasury to Invest in AIG Restructuring Un-

der the Emergency Economic Stabilization Act" (Nov. 10, 2008) is available at http://www.treas.gov/press/releases/hp1261.htm (last visited Sept. 2, 2010).

held pursuant to the deliberative process privilege.

### ii. *Draft of Secretary's Remarks*

Document W169–W171 is a "[d]raft of remarks (including redline) to be presented by the Secretary regarding [the] need for [a] comprehensive approach to relieving the stresses on U.S. financial institutions and markets ... The final draft of this statement was issued by [Treasury] on September 19, 2008, and is publicly available on its website." Treasury contends that disclosure of this document would reveal its deliberative process by disclosing suggested revisions. That assertion is belied by the actual document which does not appear to contain any suggested revisions that would be disclosed. Because Treasury has not met its burden of showing that this document is deliberative, it must be released in full.

### iii. *Congressional Relations Materials*

 Document 3236–3290 is an email thread "commenting on attached draft briefing materials prepared by Treasury staff for Secretary Paulson in anticipation of [the] Secretary's appearance at [the] House Financial Services Committee." Treasury has redacted portions of the email thread and withheld the attached briefing materials in full. Treasury contends that the redacted materials "incorporate input requested by the Secretary [which was] culled to identify the topics of greatest significance to be brought to the Secretary's attention, provide detailed statements of proposed policy initiatives and internal summaries of the potential rationales thereof—including, for example, regarding [Treasury's] then-unannounced plans aimed at ensuring compliance with its executive compensation requirements." (Second Samarias Decl. ¶ 34(g)).

This document does not merely reflect Treasury's decisions in relation to "massaging" the agency's public image. Rather, this document reflects internal agency deliberation on matters of substantive policy prior to the Secretary's public announcement of those decisions. Accordingly, this document was properly withheld.

 Document W792–W794 is a draft letter to Congressional leaders from Secretary Paulson regarding the administration of TARP, dated December 12, 2008, intended as a "response to inquiries received from Republican congressional leaders regarding Treasury's administration of TARP and its efforts to address the financial market crisis." (Second Samarias Decl. ¶ 34(b)). Treasury argues that the draft "reflects Treasury's internal deliberations on how to respond to issues raised by congressional leaders." (*Id.*). Fox counters that while Treasury may call it internal deliberation, "the description reflects nothing more than a draft document that was expected to be shared with another party." (Decl. of Steven G. Mintz, Esq., dated Feb. 12, 2010 (Docket No. 62) ("Mintz Decl."), Ex. 1).

The actual document primarily explains and defends actions that Treasury had taken over the preceding several months. Thus, most of this document is not predecisional (because it explains decisions previously made) and does not reflect deliberation on substantive policy-oriented matters. The two paragraphs on the top of W793, however, are forward-looking statements about Treasury's actions and thus are predecisional. Similarly, because the document is a draft, these paragraphs are also predeliberative, since they do not represent the final view of the agency, but, rather, only the suggestions of the author. Accordingly, these two paragraphs may be redacted, but the remainder of the document must be released.

### iv. *Emails Concerning Press Relations*

 Document 1695–1696, dated November 10, 2008, is an email thread among DPW, Treasury staff, Treasury legal,

NYFRB, and Morgan Stanley concerning that morning's anticipated AIG announcement. According to Treasury, "[t]he withheld information consists of counsel's opinions analyzing the proposed terms of the AIG TARP transaction and was circulated to assist Treasury decisionmakers in articulating Treasury's rationale related to the pending decision about AIG funding." The redacted content is found in one email, with the subject line "Messaging," sent by a DPW attorney early during the morning of the announcement. Contrary to Treasury's description, the withheld message does not reflect deliberation regarding agency policy decisions, but, rather, is a message to Treasury staff on the "[c]ritical messaging point" for the day's announcement. (*See* Document 1695). Because this message consists entirely of outside counsel's advice regarding "messaging," *i.e.*, public relations, it is not protected by the deliberative process privilege.

■ Document 1697–1697B, dated Nov. 11, 2008, is an email thread among Treasury's staff and legal team "discussing how to respond to [a] question received by Treasury regarding [an] anticipated news report concerning the AIG transaction." As explained by Treasury, "[t]he redacted portions of this November 11, 2008 email thread … concern an internal policy debate related to an unresolved accounting issue stemming from the November 10, 2008 release of the AIG/SSFI term sheet. The debate arises in the context of an attempt by Treasury [s]taff and Treasury [l]egal to decide how to respond to a press inquiry." (Second Samarias Decl. ¶ 34(d)). A review of the unredacted documents confirms that the text withheld does not relate to an internal policy issue, but simply involves a Treasury staff member attempting to obtain a factual explanation from the Treasury legal team in order to respond to a press inquiry. The email does not debate how to resolve an accounting issue; rather it is counsel's attempt to

explain a previously-resolved accounting issue. The document is neither predecisional (because there is no substantive policy decision), nor deliberative (because it answers a factual question). It therefore must be released in full.

■ Document 8614 is an email from a DPW attorney to five NYFRB employees, dated November 8, 2008, concerning "Fed Communications." (*See* Document 8614). In the email, the attorney states: "I understand we are having a media briefing Monday morning. I hereby suggest a few thoughts . . . ." (*Id.*). The remainder of the email is redacted. Document 8694–8697 is an email thread that begins with the same email from the DPW attorney and which also includes several redacted comments from individuals at NYFRB and DPW. Stephen Albrecht ("Albrecht"), Counselor to the General Counsel, is the only Treasury official copied anywhere on the email thread, and he makes no comments, redacted or not. Accordingly, both documents appear to relate to the massaging of *NYFRB's* public image, not to any deliberative decision by Treasury. The deliberative process privilege therefore is inapplicable.

■ Document 8831–8833 is an email thread reflecting communications on November 9, 2008, the day before the AIG announcement. The first email in the thread (on page 8832) was sent to various Treasury staffers by Brookly McLaughlin, the Deputy Assistant Secretary for Public Affairs at Treasury; attached to the email is the final version of the press release discussed in Section V.B.2.i above. The second email, which is redacted, contains a comment from a Treasury staff member to McLaughlin in response to the final press release. The final email from McLaughlin to Treasury staff contains (on page 8831) a "Q & A" for Treasury staff members, apparently intended to assist them in answering press inquiries the following day.

McLaughlin notes: "Also attached and pasted below are Q & A's. This will not be a publicly released document—this is just for helping us all answer questions.... [W]e will begin using these answers at 6:30 a.m. tomorrow morning." (*See* Document 8831). The text of the Q & A is redacted. The emails regarding the draft press release were properly withheld for the same reasons as the drafts of the press release itself. However, the final email, which contains a Q & A for Treasury staff, is not exempt, as it is neither predecisional with respect to a substantive policy decision nor deliberative. Rather, it is a document that gave Treasury staff members guidelines for responding to questions about a decision already made. That email consequently must be released to Fox.

### 3. *AIG Justification Memo and Systemic Risk Analyses*

 Nine documents are either versions of memos referred to variously as the "AIG Justification" memo, "Systemic Risk" memos, or the TARP "Investment Committee Memo," or emails discussing those memos.[14] Three such memos, dated early November 2008, address the "systemic risk" potentially resulting from a disorderly failure of AIG and forecast the effect of Treasury's intervention.[15] There also are several versions dated November 7, 8, and 9, 2008, of a memo "detailing [the] proposed AIG transaction ahead of [the] Investment Committee Review Meeting."[16] Treasury notes that this memo "includ[es], for example, the rationale for Treasury's proposed investment, contemplated investment considerations, an analysis of how such investment comports with EESA, and the individual analysis, opinions, and assessments of the author." Additionally, Documents 2555, 2621–2622, and 2688–2703 are emails commenting on the "AIG Justification Memo." The drafts of the memoranda, all of which are dated between November 5 and November 9, 2008, apparently were combined into a final memo for the TARP Investment Committee meeting.[17] Since the memoranda, as described by Treasury, serve similar

---

**14.** These documents are W272, 1714–1717, 1741–1762, 1765–1780, 2183–2195, 2555, 2621–2622, 2688–2703, and 8507–8530.

**15.** Document W272, a draft memo entitled "Recovery Prospects for Investment," "identifies [the] systemic implications that may arise from a disorderly failure of AIG." Document 1714–1717 is an email thread, dated November 5, 2008, from which Treasury withheld an attachment described as a "systemic pre-decisional draft paper discussing AIG and Systemic Risk." Treasury indicates that this document "summarizes the systemic risk resulting from a disorderly failure of AIG, and provides a proposed list of goals and rationales related to avoiding such failure. It was used by Treasury decisionmakers in contemplating the potential scope and effect of Treasury's $40 billion purchase of senior preferred stock in AIG." Document 2183–2195, referred to as an AIG justification memo, "summarizes the systemic risk resulting from a disorderly failure of AIG, and provides a proposed list of goals justifications related to avoiding such failure. It was used by Treasury decisionmakers ... contemplating the potential scope and effect of Treasury's $40 billion purchase of senior preferred stock in AIG."

**16.** One of the emails refers to the memo as the "justification memo." (Document 1765). Another refers to it as the "TARP Investment Committee memo." (Document 1741). The Revised *Vaughn* Index indicates, however, that both attachments are the same document.

**17.** Treasury does not explain the function of the TARP Investment Committee. Nevertheless, a Treasury press release, dated November 10, 2008, indicates that "[t]he Treasury TARP Investment Committee reviews all recommendations from the regulators. This committee includes our top officials on financial markets, economic policy, financial institutions, and financial stability, as well as the Chief Investment Officer for the TARP, who chairs the Committee." Press Release, dated

purposes, they properly are considered together.

All of these documents involve analyses and assessments of the financial condition of AIG and the effect that its collapse would have on the financial system. These documents also assess the impact of Treasury's proposed intervention. Although Fox objects that Treasury "does not identify a policy decision" to which these documents relate "other than generally whether to bail out AIG," this itself sufficiently identifies a policy decision—indeed, a rather significant one.[18] (Mintz Decl., Ex. 1 at 5). Moreover, these memoranda all predate Treasury's final decision to invest in AIG, and thus played a role in the deliberative process leading to that decision. It further is evident from an email dated November 8, 2008, sent by James Lambright, the Chief Investment Officer for TARP, to members of the TARP Investment Committee, that the purpose of the Investment Committee memo was to facilitate discussion at the TARP Investment Committee's meeting. (*See* Document 8507 ·("Attached are materials (slightly updated from yesterday's versions) for today's meeting. I look forward to discussing your questions and concerns.")). Accordingly, these memoranda are both predecisional and deliberative. Finally, because the emails commenting on the memos also were part of the process by which the deliberative memoranda discussed above were refined, they, too, are covered by the deliberative process privilege.

### 4. *Draft Guidelines and Rules*

■ A number of withheld documents relate to the drafting and revision of the SSFI Guidelines.[19] These guidelines were developed in early and mid-November and the final version was posted on the Treasury website on November 26, 2008, the day after the AIG transaction was completed.

■ Internal deliberation on a final agency rule clearly falls within the traditional scope of the deliberative process privilege. *See, e.g., Lead Indus. Ass'n,* 610 F.2d at 85–86 (agency properly withheld drafts of preamble to standards published in Federal Register); *FPL Group, Inc. v. I.R.S.,* 698 F.Supp.2d 66, 86–90 (D.D.C. 2010) (agency properly withheld materials related to development of final revenue ruling); *Trans Union LLC v. Fed. Trade Comm'n,* 141 F.Supp.2d 62, 70 (D.D.C. 2001) (agency properly withheld memorandum and email constituting deliberation prior to final agency rule). Accordingly, the drafts of the guidelines, as well as any communications regarding their drafting and revision, were properly withheld under the deliberative process privilege.

Document W2391–W2392 is a proposed interim final rule pursuant to Treasury's rulemaking authority under EESA. It was properly withheld for the same reasons.

### 5. *AIG Implementation Timeline*

■ Treasury has withheld multiple versions of a document entitled "AIG implementation timeline."[20] Treasury as-

Nov. 10, 2008, http://www.treas.gov/press/releases /hp1262.htm (last visited Sept. 2, 2010). The TARP Investment Committee apparently met to review the proposed AIG transaction on November 8, 2008. (*See* Document 8507).

**18.** Fox also contends that W272 is "factual in nature." (Mintz Decl., Ex. 1 at 5). Suffice it to say, a "forecast" with respect to such un-

precedented circumstances cannot fairly be described as merely factual.

**19.** These documents are W91–W92, 1685–1690, 2551–2554, 3035–3037, 3038–3045, 8499, 8503–8506, 8536–8537, and 8572–8583.

**20.** These documents are 1704–1706, 2464–2466, 2661–2663, 2664–2666, 2707–2708, 2767–2768.

serts that this "document details the action items required to complete the AIG TARP Transaction, and offers Treasury decision-makers a proposal for completing the transaction." An email to a team of Treasury staff members from Stephen Myrow, Chief of Staff to the Deputy Secretary, states: "Please find attached a draft implementation timeline for the proposed AIG transaction detailing the sequence of all required actions and the parties responsible for ensuring their completion. Please review the attached document and provide to me any necessary edits or additions." (Document 2662).

Nothing about this document or the email to which it is attached suggests that it is deliberative. Rather, the narrow purpose of the document is to ensure that everyone at Treasury is on the same page with respect to the administrative details of the fast-moving AIG transaction. This is consistent with Treasury's job description for Myrow, whom Treasury describes as "[r]esponsible for managing day-to-day operations of the Department in coordination with the Chief of Staff to Treasury Secretary." (*See* Fourth Samarias Decl., Ex. A at ix). Accordingly, the documents regarding the AIG Implementation Timeline must be produced.

Document W270–W271 similarly is "an AIG Workstream Timeline," described by Treasury using language substantially identical to that of the Implementation Timeline. It too must be released in full.

### 6. *AIG Workstream*

■ Treasury describes Document 8894–8896 as an email thread discussing "work streams related to [the] proposed AIG transaction"—*i.e.*, the "multiple areas of consideration underpinning the closely coordinated efforts by the NYFRB, FRB,

and Treasury aimed at providing stability and preventing the disruption to financial markets that would have been caused by the disorderly failure of AIG." In fact, the email thread concerns communications shortly after midday on September 15, 2008, the day AIG's credit ratings were downgraded, which was long before Treasury was authorized under EESA to "bail out" AIG. These emails also were exchanged among six Treasury employees, most of whom are involved in international affairs. The subject of the original email is "AIG Update." Its author, Michael Pedroni, Director of Treasury's Markets Room, begins with the observation that he "spoke to the Desk at the N.Y. Fed." (Document 8895). The remainder of the email is redacted. There is a reply from David McCormick, Under Secretary for International Affairs that asks, "Weren't they downgraded this [morning]?" (Document 8894), and a response from Pedroni (Document 8896), stating, "S & P equity research downgraded them from hold to sell, but this is different from their credit rating."

As this text suggests, and the redacted portions of the email confirm, the three emails, which span less than one-half hour, reflect the attempts of senior Treasury officials—predominantly those concerned with international markets—to understand what had happened that morning regarding AIG. Nothing about the email thread is deliberative; rather, the redacted email consists of a factual recitation from a Treasury official, relaying information obtained from NYFRB. The document must be released in full.

### 7. *Conference Call Agendas*

■ Five documents are emails containing agendas for conference calls among representatives on the government side of the AIG and Citigroup transactions (*i.e.*, Treasury, NYFRB, Morgan Stanley, and DPW).[21] In each email, the agenda items

---

**21.** These documents are 1305–1306, 1980–1985, 2126–2127, 8391–8399, and a portion of 10091–10093.

are redacted. The redacted portion of the agendas consist of a list of items to be discussed, such as the status of particular documents to be drafted. Nothing about these conference call agendas is deliberative. Accordingly, they must be released in full, except for the Exemption 2 redactions which Fox does not contest.

Within Document 8391–8399 there is an additional redaction at 8397 that contains a description of documents provided as background information on AIG. This material, too, is not deliberative and must be released in full.

### 8. *Emails Regarding the AIG Trust*

 Eight documents consist of email discussions among Treasury's outside counsel, Treasury's in-house legal and other staff, and NYFRB "regarding [the] details and content of proposed AIG trust documentation." Treasury's description indicates that these email threads relate to the final terms of the AIG trust instrument, which was formally executed in January 2009. Accordingly, the emails, all of which are dated earlier, are both predecisional and deliberative.[22]

### 9. *Draft TARP Determination Memoranda*

 Several documents are labeled draft "TARP determinations."[23] While the Revised *Vaughn* Index does not explain what a TARP determination is, the First Samarias Declaration describes the documents as "draft determination memoranda regarding whether a given financial institution was an appropriate candidate for TARP funding." (First Samarias Decl. ¶ 41). Section 3(9)(B) of EESA requires

the Treasury Secretary to submit to Congress a written determination that a given purchase of assets using TARP funds "is necessary to promote financial market stability." Presumably, this is the determination to which these documents refer.

Treasury's deliberation as to whether the purchase of certain AIG and Citigroup assets "[was] necessary to promote financial market stability" is precisely the type of policy decision protected by the deliberative process privilege. The drafts of these determinations clearly are predecisional, as they pre-date the final determination, and just as clearly are part of the actual deliberative process by which Treasury reached a final decision. Accordingly, these documents were properly withheld.

Additionally, document 8807–8811 contains, among other things, comments on the AIG determination. The comments regarding the determination were properly redacted for the same reason.

### 10. *Discussion Materials Prepared by NYFRB and Morgan Stanley for Treasury*

 Certain documents withheld in full constitute "discussion materials" prepared by NYFRB and Morgan Stanley in late October and early November 2008 to educate Treasury about AIG and its financial condition.[24] Treasury has provided a description of the analyses each document contains. For example, W2932–W2933 is described as providing information about:

> contingency plan considerations related to a proposed set of concerted actions, closely coordinated by the NYFRB,

---

**22.** Six of these email threads (2154, 2158, 2159, 2160–2161, 2162–2163, and 2164–2165) are dated in early November; two (9068–9069 and 9083–9085) are dated December 18, 2008.

**23.** These documents are W2612–W2613, a portion of 2479–2480, 8718, and a portion of 9073–9081.

**24.** These documents are W2913–W2931, W2932–W2933, W2934–W2949, W2950–W2955, W2956–W2977, W3254–3319

FRB, and Treasury, aimed at providing stability and preventing the disruption to financial markets that would have been caused by the disorderly failure of AIG. This document was used by Treasury decisionmakers to understand certain rating agency metrics related to AIG, and to determine how the proposed AIG TARP Transaction might affect those metrics.

The Revised *Vaughn* Index provides equally detailed descriptions for the other documents.

Although Treasury's descriptions do not precisely identify the role these documents played in the deliberative process, it is clear that they were created by NYFRB and its consultant Morgan Stanley, which had been "on-site" at AIG since September, (*see* 3/19/10 Tr. at 32), in order to inform Treasury officials about AIG's situation. These documents are predecisional, as they predate even the initial Treasury decisions about the terms of the AIG transaction. The documents further provide detailed analyses of AIG's financial situation and were used by Treasury decisionmakers to evaluate how to proceed with the AIG transaction. The documents therefore also are deliberative and were properly withheld.

### 11. *Discussion Regarding An AIG Executive's Compensation*

■ Document W2791–W2793 is an email thread among several DPW and Treasury attorneys as well as individuals from E & Y and NYFRB. According to Treasury, "the withheld material details potential approaches to restructuring the vesting of [a] pending equity award of a senior AIG executive in light of the contemplated AIG TARP Transaction, and was prepared by Treasury's outside counsel to assist Treasury's in-house counsel in advising Treasury decisionmakers on the proposed restructuring in light of the executive compensation requirements of Section 111 of [the] EESA." Document W2799–W2803 is an email thread with an attached spreadsheet. According to Treasury, "the email summarizes share price calculations found on the attached spreadsheet prepared in response to the analysis (set forth in W2791–W2793) of potential approaches to restructuring the vesting of [a] pending equity award for a senior AIG executive in light of the contemplated AIG TARP transaction."

The email discussion and spreadsheet analysis are clearly deliberative since they are designed to help Treasury decide how to deal with the particular problem of one AIG executive's equity compensation. Although not expressly stated in Treasury's Revised *Vaughn* Index, it also seems apparent that this analysis occurred prior to any final decision regarding the executive's compensation. Accordingly, these two documents were properly withheld pursuant to the deliberative process privilege.

### 12. *Citigroup Data Request*

■ Document 9047–9051/9055–9062 consists of several emails exchanged among Treasury legal, NYFRB, and E & Y "discussing specific issues related to [the] proposed Citi transaction, and attaching [a] summary of [a] preliminary data request for Citi related to same." According to Treasury, "the redacted information is [a] predecisional survey of data required to evaluate [the] proposed Citi transaction." Document 9052–9054, dated December 10, 2008, is an email thread that discusses a "preliminary data request for Citi." According to Treasury, "[t]he redacted information references a predecisional survey of data required to evaluate [the] proposed Citi transaction, collected as part of the deliberative process to assist Treasury decision makers in their evaluation of the proposed Citigroup/TIP transaction (including data related to Citigroup's compensation plans)."

The emails in fact discuss the creation of a data request to be sent by Treasury to Citigroup in order to collect information about Citigroup's compensation plans. The emails debate what needs to be included in the data request, and therefore are deliberative. They also predate the submission of the data request to Citigroup and thus are predecisional. Accordingly, the documents were properly withheld.

13. *Miscellaneous Documents*

Many other documents withheld or redacted by Treasury do not fit into broad categories and therefore are considered individually.

 Document W1–W4, dated December 8, 2008, provides "a summary of potential liabilities and premiums associated with the proposed Citigroup loss sharing arrangement under the [AGP] and provides Treasury decisionmakers with an analysis of estimated net gains resulting from such arrangement." Fox correctly notes that the entry "still fails to identify the decisionmaker for whom the document was prepared;" (Mintz Decl., Ex. 1 at 1), it similarly does not identify the document's author.[25] Nevertheless, the text of the document confirms that it is both deliberative and predecisional since it analyzes the results of possible scenarios to enable Treasury decisionmakers to understand the possible consequences of entering into the AGP transaction with Citigroup. The document was properly withheld.

 Document W5–W6/W174–175 is a "[d]raft analysis of AIG's Insurance–Retail Operations, Capital of Insurance Subsidiaries, Ratings, Constraints and other insurance companies." According to Treasury, the draft "provides an assessment of the risks to AIG policyholders and for the broader financial markets resulting from a disorderly failure of AIG." Treasury does not identify the author or the recipient of the document, but describes both as "Treasury Staff." Additionally, the only date on the document is the year 2008. Although the analysis appears to be deliberative, Treasury has not carried its burden of showing that the document predates Treasury's decision to intervene in AIG's financial collapse. Accordingly, the document must be released in full to Fox.

 Document W139–W140, again dated simply "2008," provides "a step-by-step explanation of the CPP application process, from submission of an institution's application to its primary federal regulator, to Treasury's assessment of such application, to the mechanics for releasing funds to successful candidates, and was prepared to solicit comments from Treasury [s]taff and [l]egal on the proposed process." Fox correctly notes that Treasury does not identify the decisionmaker(s) for whom the document was created. (Mintz Decl., Ex. 1 at 3). Unlike documents such as W1–W4 or W172, in this instance, the Court cannot determine from Treasury's description whether the document was (a) provided by decisionmakers to less senior staff members to help them process applications, or (b) generated by

---

25. These problems arise with respect to many of the documents Treasury withheld in full, probably because, unlike the redacted documents, they often do not consist of emails whose authors and recipients are clearly identified. The fact that the author and recipient cannot be discerned from the face of a document makes it more difficult for Treasury to make a full proffer and more difficult for the Court to understand the role the document played in the decisionmaking process. *See generally Grand Cent. P'ship*, 166 F.3d at 482 (quoting *Ethyl Corp. v. U.S. E.P.A.*, 25 F.3d 1241 (4th Cir.1994)) ("[R]elevant factors to be considered in determining whether privilege applies to a record are 'the identity and position of the author and any recipients of the document, along with the place of those persons within the decisional hierarchy.' ").

staff members as a proposal for decision-makers' consideration (as Treasury contends). Accordingly, even though the document may be predecisional, Treasury has not sustained its burden of showing that it is deliberate. The document therefore must be released to Fox.[26]

■ Document W172–W173 is a "[d]raft analysis comparing and contrasting [the] Asset Guaranty Model and Aggregator Bank Model, and includ[es] specific pros and cons related to various approaches proposed by Treasury officials." Treasury contends that the document also "contributed to Treasury's decision to institute the AGP." Although Treasury failed to specify who prepared or received this document in the Revised *Vaughn* Index, it nevertheless is clear that this document is both deliberative (because it assessed multiple options) and predecisional (because it predated Treasury's decision to institute the AGP). The document therefore was properly withheld.

■ Document W236–237 is a chart prepared in March 2009 providing a side-by-side comparison of the corporate governance provisions contained in certain TARP-related programs. The actual chart consists of purely factual information. Consequently, this document is not deliberative. It also is not predecisional because it post-dates the TARP transactions it details. Treasury therefore must release this document in full to Fox.

■ Documents W238–W269 and W750–W767 are draft Microsoft PowerPoint presentations related to policy issues concerning CPP. Document W238–W269 "identifies certain TARP objectives, provides a summary of market turmoil facing Treasury Decisionmakers, provides an overview of the need for capital injections into financial institutions and identifies policy issues related to same." Specifically, the PowerPoint discusses the potential expansion of CPP to include Subchapter S corporations and mutual holding companies. Document W750–W767 also discusses the potential expansion of CPP to include S–Corps and mutual holding companies and provides preliminary recommendations related to that decision. For both documents, Treasury has identified a particular decision facing it (whether to extend the scope of CPP) and the analysis is clearly both deliberative and predecisional. These documents consequently were properly withheld.

■ Document W327–W328/W1583–1584 consists of multiple copies of an "interagency draft paper discussing AIG and systemic risk." The paper "provides the FRB's assessment of its grant of authority to NYFRB to establish a revolving credit facility for AIG." Fox notes that this document does not reflect a decision to be made by Treasury, "but is a communication by the [FRB] regarding the Board's statutory authority." (Mintz Decl., Ex. 1 at 6). There is no reason that the interagency deliberative process privilege cannot extend to documents in Treasury's possession that reflect the FRB's internal deliberations. However, even if the document is deliberative, it is not predecisional. Instead, the document, dated October 30, 2008, explains the reasoning behind FRB's decision on September 16, 2008, to authorize NYFRB to provide a credit facility to AIG. The document consequently explains a decision already made and cannot be predecisional. It therefore must be released in full.

---

**26.** The fact that the document was not finalized also does not preclude the possibility that Treasury staff used this document to process CPP applications until it was finalized.

Document W2446 is an email between Stephanie Heller at NYFRB and Albrecht at Treasury discussing DPW's fees. It is not responsive to Fox's requests and therefore need not be produced.

■ Document W2497 is an email, dated November 5, 2008, from an NYFRB attorney to a Treasury attorney and a DPW attorney "requesting analysis by [the] Treasury attorney on allocation of certain stock to TARP." According to Treasury, disclosure would reveal deliberation "regarding how to allocate equity resulting from Treasury's investment in AIG pursuant to the AIG TARP Transaction." The email thread reflects deliberation among three senior attorneys involved in the AIG TARP transaction, and predates the final decision as to the basic terms and logistics of the AIG transaction. It consequently was properly withheld.

■ Document W2511–W2540 is an email thread among DPW, NYFRB, and Treasury's legal team "providing [an] analysis of [DPW] on draft AIG compensation agreements provided by AIG and its counsel." The email "provides [DPW's] distillation of a proposed employment letter and restricted stock unit award related to a senior AIG executive. This document was prepared by outside counsel to assist Treasury decisionmakers [to] understand the proposed AIG employment transaction as well as [to] determine whether to modify (and if so, how) certain performance conditions in ·light of the proposed AIG TARP Transaction." The document thus reflects deliberation among the relevant parties regarding a particular employment transaction. It therefore meets the predecisional and deliberative requirements of the privilege.

■ Documents W2719 and 8972–8983, discussed above, are email threads among NYFRB, DPW, and Treasury discussing the mechanics of the AIG transaction. As noted above, certain of the emails are not "intra-agency" because NYFRB was pursuing its own interests, rather than acting as a consultant to Treasury. The remaining emails among Treasury and DPW discuss whether to accede to NYFRB's request as to how funds should be transferred. These emails were properly withheld under the deliberative process privilege.

■ Document W3210–W3211/W3212–W3213 is an email from a Treasury staff member to the Vice–President of NYFRB and the Chief Investment Officer for TARP funds, dated November 1, 2008, "providing an update on rating agencies with respect to AIG." Specifically, the email addresses "the rating agencies' potential decisions regarding AIG, and was circulated to Treasury decisionmakers to assist them in understanding how the proposed AIG TARP Transaction might affect those ratings." Because this email is an analysis prepared by one staff member for two prominent decisionmakers involved in the AIG TARP transaction, the document was properly withheld.

■ The redacted portion of document W3323–W3356, dated December 23, 2008, is a "presentation prepared by NYFRB related to Citigroup's executive compensation program." According to Treasury, the document addresses "how Treasury should structure the executive compensation provisions of its contemplated Citigroup/TIP transaction in light of Citigroup's existing executive compensation programs and practices, and how Treasury would monitor Citigroup's compliance with both the general TARP restrictions on executive compensation and any additional provisions ultimately included in the Citigroup/TIP transaction document." This document is an analysis that NYFRB and PwC provided to Treasury to assist Treasury decisionmakers in their deliberations regarding the structure of the Citi-

group/TIP transaction and thus was withheld properly.

██ Document W3357–W3358 is an email thread, dated December 9, 2008, among Treasury staff and Treasury legal regarding "ring-fenced assets." Specifically, the document "summarizes on-going negotiations with Citigroup, the status of contemplate[d] legal documents, and identifies issues requiring resolution regarding certain proposed terms within the draft Citigroup/AGP agreement." The email thread appears to consist of deliberative discussions among Treasury staff and attorneys regarding multiple topics— including transaction terms—related to the Citigroup AGP transaction, which was not finalized until December 31, 2008. Accordingly, this email was properly withheld.

██ Document 2155 is an email thread among Treasury staff and Treasury legal team members "regarding [the] drafting of proposed documents related to [the] contemplated AIG transaction." The redactions, which are contained in an email from Albrecht to other members of the Treasury legal team, relate solely to the process of drafting proposed documents. Although the comments identify unresolved policy-oriented issues, the email does not suggest solutions; instead, it simply provides instructions regarding non-substantive aspects of the drafting process, such as what template to use and who will be responsible for the drafting. Accordingly, this document must be released (except for the Exemption 6 redactions).

██ Document 2299–2300, dated November 5, 2008, is an email thread "regarding fund timing for [the] proposed AIG deal ... and was circulated to assist Treasury decisionmakers in their consideration of the timing of the $40 billion purchase of senior preferred stock pursuant to the AIG TARP transaction." My *in camera* review confirms that this document relates to substantive policy decisions, including the timing of funding required by EESA and Treasury's compliance with those requirements. The document therefore was properly redacted.

██ Document 2301–2304, dated November 5, 2008, is an email thread "regarding [the] timing of [the] proposed announcement [of the] AIG transaction." The unredacted portions of the email thread indicate that the discussion focuses on whether a Sunday announcement would be appropriate and the likelihood that AIG would approve of that timing. (*See* Document 2301) (email with subject "Sunday"). This does not appear to be deliberation regarding the sort of substantive policy decision that is protected by the deliberative process privilege. Accordingly, the document must be released in full to Fox.

██ Within Documents 2312–2315 and 2317–2337, Treasury has redacted an email, dated November 6, 2008 "summarizing [a] call Treasury's outside legal counsel had with AIG on various executive compensation issues, and offering questions and opinions regarding issues related to restrictions on severance pay and bonuses, retention bonuses and other compensation matters." Treasury has met its burden of showing that this email contains substantive discussion and recommendations with respect to AIG's executive compensation provisions, and thus is deliberative. Since the email is dated before the transaction terms were finalized, it also is predecisional and was properly withheld.

██ Document 2479–2480, dated November 6, 2008, is an email thread "transmitting [a] draft of [a] letter to Congress and [the] Senate related to Treasury's determination regarding [the] AIG transaction." As noted above, the attachment, which is a draft of the TARP determination, was properly withheld. (*See supra*

Section V.B.9). Treasury also withholds portions of the email itself because they "provide ... proposed executive compensation limitations to be applied to any company participating in the yet-to-be-announced SSFI program." Since this email, according to Treasury, contains proposed rules for companies participating in the SSFI program and predates the announcement of the SSFI program on November 10, 2008 and the publication of the final SSFI guidelines on November 25, 2008, it is both deliberative and predecisional. The email therefore was properly redacted.

██ Document 2543–2545, dated November 5 and 6, 2008, is an email thread "regarding [a] request for [a] conference call related to AIG compensation issues, and commenting on [a] conversation with AIG regarding compensation issues." According to Treasury, "the withheld information reflects discussions regarding a pre-decisional draft document regarding possible approaches to take with respect to outstanding policy issues and was circulated to assist Treasury decisionmakers in their consideration of the proposed terms and conditions of what ultimately became the AIG TARP transaction." The earliest email in the thread is from a DPW attorney with the subject line "Call with AIG 11/5/08." (*See* Document 2543). Although Treasury's description suggests that the email might simply be a factual recitation of what was discussed during the telephone call, the actual email in fact contains substantive responses to, and discussions about, statements made by AIG during the conference call. Any purely factual material contained in the email cannot be separated from the substantive discussion. Accordingly, the document is both deliberative and predecisional, as it predates final decisions on executive compensation limitations. The document consequently was properly withheld.

██ Document 2812–2813 is an email exchange on November 8, 2008, primarily between Albrecht and a DPW attorney, concerning AIG compensation. According to Treasury, the email thread includes "responses from Treasury's outside legal counsel to questions raised by Treasury legal." Having reviewed the document, I find it is both deliberative and predecisional. The email thread consists of a substantive discussion between Albrecht and a DPW attorney concerning AIG's compensation, during which the DPW attorney responds to Albrecht's questions about AIG's existing compensation structure and provides feedback about Albrecht's suggestions as to how to structure the executive compensation provision of the AIG transaction. Furthermore, because the email discussion takes place before the terms of the AIG transaction were finalized, it is predecisional. Accordingly, the document was properly withheld.

██ Document 8551–8552 is an email exchange, dated November 7 and 8, 2008, which is mostly between Albrecht and Donald Hammond, the Chief Compliance Officer for OFS. Albrecht forwarded AIG's proposal regarding its executive compensation provisions to a number of Treasury staff, asking for input. (*See* Document 8552). The unredacted portions of the email thread confirm that the exchange between Albrecht and Hammond was a deliberative discussion concerning AIG's proposal. The exchange also took place prior to the final decision regarding the AIG transaction terms. This document consequently was properly withheld.

██ Document 8611 is an email thread which begins with AIG's proposal of "some possible language" to Treasury, NYFRB, and DPW. (Document 8611). Treasury redacts under Exemption 5 an email, dated November 8, 2008, that a DPW attorney sent to Albrecht and NYFRB attorneys

responding to this suggested language. The text redacted under Exemption 5 contains a deliberative comment by DPW in response to AIG's proposed language. Since the email was sent before the terms of the AIG transaction were finalized, it is predecisional. As a consequence, the redacted portion of the email was properly withheld.

Document 8713 is an email, dated November 9, 2008, between the deputy general counsel of the FRB and Albrecht, "regarding issues related to [the] structure of AIG convertible preferred stock in anticipated AIG transaction." My review confirms that it contains a substantive discussion regarding the voting rights of the AIG stock to be acquired by Treasury, including a proposal by the deputy general counsel of the FRB. Accordingly, this predecisional document was properly redacted.

Document 8750–8758 is an email thread on November 9, 2008, among Treasury staff, Treasury legal, DPW, NYFRB, and AIG concerning finalization of a "miscellaneous" section of the AIG term sheet the day prior to its final release. Treasury withheld pursuant to Exemption 5 the portions of the email thread among Albrecht, DPW, and several senior Treasury officials discussing "the last issue before we have a final term sheet." (*See* Document 8752). In a portion of the email redacted under Exemption 5, Albrecht explains the final issue and seeks approval from the TARP Chief Investment Officer, the Assistant Secretary for Financial Stability, the Undersecretary for Domestic Finance, and the Senior Advisor to the Undersecretary for Domestic Finance. Because this email reflects Treasury legal's suggestion to Treasury decisionmakers regarding their final sign-off before the public announcement, it is both deliberative and predecisional. The redacted portion of the email from Albrecht therefore was properly

withheld. On the other hand, the remaining redactions under Exemption 5 which consists of the Treasury's decisionmakers final sign-off are not deliberative. Those emails must be released in full.

Document 8807–8811 is an email attaching the AIG TARP determination memorandum, a "decision memo" for Secretary Paulson, and a model transmittal letter to Congressional committees for clearance for Secretary Paulson's signature. (The attachments are not included.) Treasury has redacted comments from several Treasury officials regarding the attached documents. Since these comments apparently were necessary before the documents could be "cleared" for the signature of the Secretary, the ultimate decisionmaker, they embody the give-and-take of agency deliberation. Moreover, because this email thread takes place between November 7 and 9, 2008, prior to a final sign-off on these documents and the AIG transaction, the discussion is also predecisional. Accordingly, the redacted comments were properly withheld.

Document 8812–8817 consists of two separate email threads, dated between October 24 and November 9, 2008, among Treasury attorneys and DPW attorneys, "commenting on [a] proposal related to AIG preferred voting rights." In the redacted portions of both email threads, NYFRB and Treasury discuss their response to the FRB voting rights proposal that was the subject of the email on page 8813. For this reason, the redacted portion of the document was properly withheld.

Document 8875–8881/8883–8889 is an email thread, on December 22 and 23, 2008, "regarding proposed revisions to draft 8–K filing and to draft press release related to an anticipated NYFRB sponsored transaction with AIG not involving

TARP funds." According to Treasury, "the redacted portions of the email thread ... comment on a draft press release prepared in anticipation of a contemplated NYFRB–AIG transaction (which was announced on December 24, 2008) and a draft 8–K report (which was filed on December 24, 2008)." (Second Samarias Decl. ¶ 34(k)). The redacted emails, however, are from NYFRB staff or DPW, not from Treasury. Treasury has not identified a Treasury policy decision implicated in the discussion. Moreover, because Treasury maintains that NYFRB is not an agency, it cannot withhold NYFRB's deliberations as to policy decisions. This document therefore cannot be withheld under the deliberative process privilege.

■ Document 9073–9081, dated December 18, 2008, is an "[e]mail among Treasury [l]egal attaching [the] draft Treasury systemic risk memo and draft Treasury determination, both concerning the contemplated Citi transaction, for review and comment." As noted earlier, the draft Treasury determination regarding the proposed Citigroup transaction falls squarely within Exemption 5. (*See supra* Section V.B.9). The "systemic risk memo" regarding Citigroup presumably played the same role as its counterpart did in connection with the AIG transaction. Accordingly, the redaction of this document was proper. (*See supra* Section V.B.3).

■ Document 9152–9161 is an email thread among Treasury staff, Treasury legal, and Treasury outside counsel "seeking Treasury input related to the application to CDOs [of the foreign assets test] in [the] proposed Citi transaction, with Treasury responding to same." (*See also* Document 9152) (discussing " 'foreign assets' definition"). The redacted portions of the email include both a Cleary attorney's personal understanding of the current agreement and specific instructions from outside and in-house legal counsel as to language.

Accordingly, the redacted portions of this document were properly withheld.

■ Document 9341–9346 is an email thread, primarily between Albrecht and an individual at PwC, concerning a forthcoming conference call with Citigroup. According to Treasury, the emails "discuss [an] issue to be included and clarified during a call with Citi." The redacted text, however, relates almost entirely to logistical matters concerning the establishment of the conference call. This document, with one exception, therefore must be released. The exception consists of the third and fourth sentences of the email from Albrecht to James Hennessy and others at pages 9341 and 9344, which reveal Treasury's tentative position.

■ Document 9349–9362 is an email thread among Treasury, NYFRB, FDIC, and PwC. The initial email in the thread attaches PwC's comments regarding Citigroup's expense and lobbying policies. (*See* Documents 9360–9361). (The attachment is not actually included in this document). The redacted materials reflect subsequent discussions by attorneys at NYFRB and Treasury concerning the Citigroup lobbying policies; accordingly, the redacted information appears to be both deliberative and predecisional.

### C. *Attorney–Client Privilege*

Treasury relies on the attorney-client privilege as to eleven documents for which it does not also claim the deliberative process privilege. In addition, there are six documents for which Treasury's claim of deliberative process privilege has been rejected, leaving only attorney-client privilege as a potential basis for the documents to be redacted or withheld. Finally, there is one document which I consider only under attorney-client privilege, even though Treasury also withheld it pursuant to the deliberative process privilege.

Treasury's attorney-client privilege claims in this FOIA case are governed by federal law. *See* Fed.R.Evid. 501 (privilege in federal question cases "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience"). Accordingly, to withhold a document based upon the attorney-client privilege, Treasury must show that it reflects "(1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice." *United States v. Constr. Prods. Research, Inc.,* 73 F.3d 464, 473 (2d Cir.1996). The privilege is generally intended to "encourage clients to make full disclosure to their attorneys" to ensure the quality of subsequent legal advice. *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). In the governmental context, "[a]ccess to legal advice by officials responsible for formulating, implementing and monitoring governmental policy is fundamental to 'promot[ing] broader public interests in the observance of law and administration of justice.' " *In re County of Erie,* 473 F.3d 413, 419 (2d Cir.2007) (quoting *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)).

### 1. *Policy vs. Legal Advice*

It bears emphasis that the attorney-client privilege protects only legal advice, not economic, business, or policy advice. *County of Erie,* 473 F.3d at 419 (considering "whether the communications were made for the purpose of obtaining or providing legal advice, as opposed to advice on policy"); *see also TVT Records v. Island Def Jam Music Grp.,* 214 F.R.D. 143, 144 (S.D.N.Y.2003) ("[O]nly those communications related to legal, as contrasted with business, advice are protected.") (internal quotation marks omitted);

*First Chi. Int'l v. United Exch. Co.,* 125 F.R.D. 55, 57 (S.D.N.Y.1989) (noting that the "attorney-client privilege is more difficult to apply in the corporate setting"). Thus, to the extent attorneys were advising Treasury about such topics as complying with EESA or how the new statute interacted with existing law, their communications plainly were privileged. On the other hand, advice about "risks or costs in terms of expense, politics, insurance, commerce, morals, and appearances" typically is not legal advice. *County of Erie,* 473 F.3d at 420.

In *County of Erie,* the Second Circuit held that the test for deciding whether a communication that contain both legal and non-legal advice is privileged is whether the "predominant purpose of the communication is to render or solicit legal advice." *Id.* Where that is the predominant purpose, other "considerations and caveats" are not severable and the entire communication is privileged. *Id.* Moreover, when the legal advice is "incidental to the nonlegal advice that is the predominant purpose of the communication," redaction may be appropriate to preserve the privileged information. *Id.* at 421 n. 8.

A court cannot determine the predominant purpose of a communication merely "by quantification or classification of one passage or another." *Id.* at 420. Rather, the communication "should be assessed dynamically and in light of the advice being sought or rendered, as well as the relationship between advice that can be rendered only by consulting the legal authorities and advice that can be given by a non-lawyer." *Id.* at 420–21.

The first document that must be judged by these standards is Document W2714–W2717/W3152–W3155, an email thread "commenting on [the] AIG quarter-

ly bonus chart received from AIG's counsel." Treasury claims attorney-client privilege with respect to a single email on W2714 from its outside counsel to a Treasury attorney. Although the email is between counsel and a client, the communication does not appear to be for the purpose of seeking or furnishing legal advice. Rather, outside counsel is simply summarizing an attachment previously sent by AIG. This email consequently must be disclosed.

■ Document W2882 is an email thread involving two Treasury in-house attorneys and three Treasury staff members, which "respond[s] to questions regarding Citi's lobbying activities and offer[s] opinion[s] as to possible future course of action." Treasury indicates that the email thread discusses Citigroup's lobbying activities "in light of the TARP transactions." In fact, the redacted text contains only a Treasury attorney's factual prediction regarding Citigroup's future activities, rather than any legal advice. This document therefore must be released in full.

■ As noted previously, Document 1697–1697B is an email thread among Treasury staff and Treasury legal "discussing how to respond to [a] question received by Treasury regarding [an] anticipated news report concerning the AIG transaction." The question evidently was posed by an internet journalist. In context, it seems clear that the predominant purpose of the communication was to answer a factual question about an accounting issue, not to provide legal advice. Accordingly, the document must be released in full.

■ Document 2731–2766 is an email thread "attaching drafts and redlines of [the] AIG Term Sheet and Trust Equity document." Although this email thread consists of emails among outside legal counsel and several members of Treasury's legal department, the redacted text does not relate to legal advice. Rather, it consists of non-substantive communications, some part of which concerns whether the parties were working on the most up-to-date draft of the AIG term sheet. Thus, the emails on 2731 for which Treasury claims attorney-client privilege must be released.

■ Document 8619–8629 is an email thread "commenting on proposed revisions to [the] draft AIG term sheet." The redacted email is from Albrecht to several DPW attorneys and discusses substantive edits and legal issues in the transactional draft documents. Since the communications were for the purpose of obtaining or providing legal advice, this document was properly withheld.

■ Document 8594–8595 is an email thread, dated November 8, 2008, in which Treasury attorneys discuss AIG's lobbying policies after the policies were forwarded to them. The redacted text reflects legal advice concerning the propriety of AIG's lobbying policies in light of its request for government assistance. Accordingly, the redacted material was properly withheld.

■ Document 8995–8996 is an email thread among in-house Treasury attorneys and DPW attorneys "providing comments to [a] draft [of the] AIG term sheet." The redacted email, from a DPW attorney to Albrecht, provides a legal analysis of edits suggested by AIG's counsel. The predominant purpose of this communication clearly was to provide legal advice. This document thus was properly withheld.

■ Document 9003–9004 is an "[e]mail thread among Treasury [l]egal and Treasury [s]taff discussing certain policy implications of [the] contemplated Citi transaction in [the] wake of [a] *Washington Post* article about the government's plan to help Citi." According to Treasury, the "legal issues identified in the redacted

text were identified for the purpose of providing advice to decisionmakers with respect to a particular policy issue." Although the redacted portions of the emails make reference to "[e]xec comp," it is clear that the predominant purpose of these communications was not to seek or provide legal advice; therefore this document must be released in full.

Document 9005 is an email thread among Treasury staff and Treasury legal "discussing how to respond to a question regarding Citigroup asked by Financial Week ... [The] document reflects the solicitation of advice by Treasury [s]taff to Treasury [l]egal as to how best to handle a press inquiry." Treasury's description is accurate, but there is no indication that the attorney in question was asked for (much less provided) legal advice. Accordingly, this document must be released in full.

Documents 9576–9584 and 9617–9622 are email threads "discussing [the] execution of draft waiver provisions related to [the] contemplated Citi transaction." The email threads consist of discussion among Treasury's outside counsel and Treasury's in-house legal department regarding the legal consequences of a course of action. Accordingly, they were properly withheld.

Documents 9597–9598/9615–9616 are email threads "commenting on revised waiver provisions related to [the] contemplated Citi transaction and providing responses to internal questions raised by the same." These emails, which were circulated among Treasury attorneys and STB attorneys, consist of substantive discussion concerning the revision of the executive compensation provisions of the Citigroup transaction. Accordingly, this document was properly withheld.

Document 9623–9625/9640–9644 is an email thread regarding revisions to the Citigroup executive compensation provision. Treasury redacts emails on 9624 among STB attorneys and Treasury attorneys because they "concern conversations between Treasury's outside and inside legal counsel regarding proposed executive compensation provisions for the Citi transaction." The unredacted document confirms that the emails incorporate the STB attorney's advice regarding the legal impact of certain contractual provisions. Accordingly, this document was properly withheld.

Document 9726–9728 is an email thread "discussing proposed executive compensation provisions in [the] contemplated Citi transaction." The substantive discussion in this emails among Treasury and DPW attorneys includes consideration of language suggestions from Citigroup as well as the legal impact of certain language changes. Because the predominant purpose of these communications was to solicit and provide legal advice, the redacted portion of the document was properly withheld under attorney-client privilege.

Finally, there are six other documents which did not qualify as deliberative process documents because they were factual or related exclusively to public relations concerns.[27] For the same reasons, these documents also cannot be withheld on attorney-client privilege grounds.

2. *The "Common Interest" Doctrine*

NYFRB was a party to certain communications for which Treasury claims attorney-client privilege. Treasury contends that the presence of NYFRB, a third-party to Treasury's attorney-client relationship, should not defeat the privilege because

---

27. These documents are W236–237, 1695–1696, 2155, 2664–2666, 2707–2708, and 8972–8983.

these communications are covered by the "common interest" doctrine.

■■■■ The common interest doctrine "is an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waives any applicable privilege." *Sokol v. Wyeth, Inc.*, No. 07 Civ. 8442(SHS)(KNF), 2008 WL 3166662, at *5 (S.D.N.Y. Aug. 4, 2008). For the "common interest" doctrine to apply, a party must show that "[(a)] the communications were made in the course of a joint defense effort or that the clients share a common legal interest; [(b)] the statements were designed to further the common effort; and [(c)] the privilege has not been waived." *Strougo v. BEA Assocs.*, 199 F.R.D. 515, 525 (S.D.N.Y.2001) (internal citation omitted).

■■■■ The interest must be a common legal interest, not merely a common commercial interest. *See, e.g., Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*, 215 F.R.D. 466, 471 (S.D.N.Y.2003); *Bank of America, N.A. v. Terra Nova Ins. Co.*, 211 F.Supp.2d 493, 496 (S.D.N.Y.2002). Such a common interest exists where "the parties have been, or may potentially become, co-parties to a litigation ... or have formed a coordinated legal strategy." *In re Subpoena Duces Tecum Served on N.Y. Marine & Gen. Ins. Co.*, No. M 8–85 (MHD), 1997 WL 599399, at *4 (S.D.N.Y. 1997) (citing *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 448 (S.D.N.Y.1995)). Although the doctrine is most frequently applied in the context of litigation, it also has been successfully invoked with respect to joint legal strategies in non-litigation settings. For example, in *United States v. United Technologies Corp.*, 979 F.Supp. 108, 112 (D.Conn.1997), the members of a consortium shared legal advice in an effort to minimize their tax liabilities. The court upheld the assertion of privilege because virtually all of the documents for which protection was sought "pertain[ed] to the development of a common legal strategy regarding the tax structure" of the consortium and "the members acted not as adversaries negotiating at arms length but as collaborators." *Id.*

■■■■ It is, of course, unnecessary to consider the applicability of the common interest doctrine if redactions properly were made under another recognized FOIA exemption. In this case, all but one of the documents on which NYFRB was copied were properly withheld under the deliberative process privilege. The remaining document, Document 8875–8881/8883–8889, consists of several email threads among DPW attorneys and NYFRB attorneys and staff regarding the disclosures AIG was required to make to the SEC in its Form 8–K. The predominant purpose of these communications unquestionably was to seek legal advice. Thus the document is an attorney-client communication. The entity to which legal advice was being provided, however, was NYFRB. Albrecht, a Treasury attorney, also is copied on the emails, although he does not take part in the discussion. Accordingly, NYFRB's privilege has been waived unless Treasury can invoke the common interest doctrine. Here, NYFRB and Treasury shared a common legal interest in having AIG make a proper disclosure to the SEC. Moreover, the communications were made in furtherance of that common legal interest. The involvement of Albrecht, a third party to the attorney-client relationship, therefore does not destroy the privilege because the communications are covered by the common interest doctrine.

## VI. *Exemption 4*

■■■■ Exemption 4 protects "the confidentiality of information which is obtained by the Government through questionnaires

or other inquiries, but which would customarily not be released to the public by the person from whom it was obtained." *Nat'l Parks and Conservation Ass'n v. Morton,* 498 F.2d 765, 766 (1974) (quoting S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965)). For Exemption 4 to apply, the information "must be a trade secret or commercial or financial in character," must be "obtained from a person," and must be "privileged or confidential." *Inner City Press/Cmty. on the Move v. Bd. of Governors of the Fed. Reserve Sys.,* 463 F.3d 239, 244 (2d Cir.2006) (internal quotation marks omitted).

### A. *Commercial or Financial*

There is no dispute that the information that Treasury seeks to withhold under Exemption 4 is "commercial or financial in character." (Fox Mem. at 28). Moreover, Treasury alleges that the redacted material consists of sensitive information related to the operations, structure, and capacities of NYFRB, Citigroup, BONY, and AIG. (Treasury Mem. at 38).

### B. *Obtained from a Person*

The statutory definition of a person "includes an individual, partnership, corporation, association, or public or private organization other than an agency." 5 U.S.C. § 551(2). The definition thus includes all entities except for agencies. In its memorandum of law, Fox argues that NYFRB is an agency and, thus, not a "person" for purposes of Exemption 4. (Fox Mem. at 29). Having found that all of the NYFRB documents for which Treasury is claiming Exemption 4 were properly withheld under Exemption 5, I need not resolve whether the NYFRB is an agency. (Fox does not contend that any other entities are not "persons" for purposes of Exemption 4.)

### C. *Confidential*

To determine whether information is "confidential" within the meaning of Exemption 4, courts in this Circuit traditionally apply a two-part test. Under this test, information is confidential for purposes of Exemption 4 if disclosure "would have the effect either: '(1) of impairing the government's ability to obtain information—necessary information—in the future, or (2) of causing substantial harm to the competitive position of the person from whom the information was obtained.'" *Inner City Press,* 463 F.3d at 244 (quoting *Cont'l Stock Transfer & Trust Co. v. SEC,* 566 F.2d 373, 375 (2d Cir.1977) (per curiam)). Treasury contends that at least one of these alternatives is applicable to each of the documents it seeks to withhold under Exemption 4.

#### 1. *Impairment of Information–Gathering*

In four documents, Treasury has redacted the bank account information of the entities that received TARP funds under Exemption 4, contending that these and other entities would be reluctant to provide this information in the future if it were to be released. These documents are W2843, W2844–W2846, W2860, and W2861. The documents previously were withheld in full pursuant to Exemption 2, which relates to internal administrative practices. On September 4, 2009, Treasury made a discretionary release of these documents except for the material redacted pursuant to Exemption 4. (*See* Letter to the Court from Carolina A. Fornos, Ass't U.S. Att'y, dated May 4, 2010 ("Fornos Letter"), at 1). "[W]here the Government has obligated itself in good faith not to disclose documents or information which it receives, it should be able to honor such obligations." *Nat'l Parks,* 498 F.2d at 768 (quoting H.R.Rep. No. 89–1497 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2427). Here, it does

not appear that Fox has any real interest in this information. (*See* Fox Mem. at 36) ("Fox ... has no particular interest in the process Treasury uses to wire money[.]") (internal quotation marks omitted). In any event, it seems clear that Treasury needs to be able to maintain the confidentiality of sensitive banking records to ensure that it will continue to have an effective working relationship with banks and other similar entities. These redactions therefore were appropriate.

## 2. *Competitive Harm*

 The second category of confidential information protected by Exemption 4 is that which, if disclosed, would cause competitive harm to the "person" who provided the information to the agency. Although it is not necessary to show that disclosure "certainly" would cause substantial competitive harm, Treasury must show that disclosure is "likely" to do so. *McDonnell Douglas v. U.S. Dep't of the Air Force,* 375 F.3d 1182, 1187 (D.C.Cir.2004). Moreover, competitive harm is "limited to harm flowing from the affirmative use of proprietary information by competitors," and does not include injury from "customer or employee disgruntlement" or "embarrassing publicity." *Pub. Citizen Health Research Grp. v. FDA,* 704 F.2d 1280, 1291 n. 30 (D.C.Cir.1983); *accord Bloomberg L.P. v. Bd. of Governors of Fed. Reserve Sys.,* 649 F.Supp.2d 262, 279 (S.D.N.Y.2009).

### i. *Identification of bank that applied for CPP funds*

 On two documents otherwise released in full, Treasury has redacted the name of a commercial bank that "applied for [CPP] funding but subsequently withdrew its application." (*See* Fornos Letter at 1). The first, Document W2872, is a letter from Treasury to BONY stating that Treasury would be transferring almost $2 billion to BONY on December 23, 2008,

and instructing BONY to pay the money to a list of financial institutions. The second, Document W2875, is a letter in which Treasury notified BONY that the bank at issue withdrew its application for CPP funding.

In the Second Samarias Declaration, Treasury argues that "[d]isclosure of this information would likely give rise to speculation or rumors about the reasons why the application was withdrawn. Such speculation could reasonably be expected to harm the institution in question, by causing a loss of confidence in the institution, resulting in an outflow of deposits, a decline in the institution's stock price[,] or other adverse consequences. Any of these events is likely to result in substantial competitive harm to the institution's position in the market." (Second Samarias Decl. ¶ 44). In response, Fox argues that Exemption 4 cannot shield the name of a bank that applied for CPP because the record was generated by the agency, not the bank. Thus, the information was not obtained from a person. (*See* Letter to the Court from Steven G. Mintz, Esq., dated May 6, 2010, at 2).

The Second Circuit confronted a similar factual situation recently in *Bloomberg, L.P. v. Board of Governors of the Federal Reserve System,* 601 F.3d 143 (2d Cir. 2010). In that case, the plaintiff sought "detail about loans that the twelve Federal Reserve Banks made to private banks in April and May 2008 at the Discount Window," but the agency withheld responsive records under Exemption 4. *Id.* at 145. The Second Circuit held that the requested information, including the identities of the borrowing banks, "was not 'obtained from' the borrowing banks within the meaning of FOIA Exemption 4." *Id.* at 147. Accordingly, Exemption 4 was inapplicable. *Id.*

*Bloomberg* is dispositive here. The name of the borrowing bank that later

withdrew, which was contained in a letter generated by Treasury listing CPP fund recipients, "was generated within [Treasury] upon its decision to grant a loan. Like the loan itself, [the information requested] did not come into existence until [Treasury] made the decision to approve the loan request." *Id.* at 148. Accordingly, the information must be produced.

### ii. BONY

▇▇▇ Treasury also relies upon Exemption 4 at BONY's request to protect the confidentiality of "the proposal . . . BONY submitted to Treasury in response to Treasury's solicitations for bids to provide custodian, accounting, auction management, and other infrastructure services in connection with TARP."[28] (Treasury Mem. at 42–43). BONY asserts that the proposal contains considerable confidential information submitted for the purpose of competing with the other applicants, including the disclosure of its "technology capabilities, business methods, business personnel, and strategies for addressing the challenges raised in Treasury's solicitation." (*Id.* at 43). BONY proffers five reasons why release of this information allegedly would cause it competitive harm. First, such disclosure allegedly would afford competitors insight into BONY's "business acumen" and "strategic decisions." (Decl. of Robert L. Griffin, dated June 22, 2009 (Docket No. 33), ¶¶ 9–11). Second, it "would permit competitors to see the functionality and purpose of BONY's custom-designed systems." (*Id.* ¶ 12). Third, release of the information would increase the risk of a "breach of [its] computer system." (*Id.* ¶ 13). Fourth, release of the pricing structure in the proposal could be used to undercut BONY's

future bids. (*Id.* ¶ 14). Fifth, releasing the names of senior executives selected for participation in the TARP programs could lead to the poaching of these employees. (*Id.* ¶ 15).

Fox contends that "competitive pricing [information] is generally not exempt from disclosure under FOIA when it is submitted as part of a bid for a government contract because the courts consider the provision of such information to federal agencies as part of the cost of doing business with the government." (Fox Mem. at 35). Treasury counters that this is not simply a matter of the proposed cost of doing the job, but rather BONY's proprietary method for pricing its services. (Treasury Reply Mem. at 51–52).

As might be expected, the "pricing structure" in the BONY proposal contains proprietary information about BONY, not just a net price or price list. Moreover, it does not seem feasible to redact the proposal to disclose all of the information that is not price-related. Finally, Fox has not challenged the remaining bases on which Treasury withholds the proposal. For these reasons, the BONY proposal documents were properly withheld.

### iii. AIG

Treasury also withholds a substantial number of documents based on AIG's objection that their release would cause competitive harm to AIG. AIG propounds several different theories of competitive harm, each of which is considered below.

### a. Compensation Data

Treasury withholds numerous documents on the theory that the release of compensation-related information would allow AIG's competitors to "poach" key AIG employees.[29] (Treasury Mem. at 45).

**28.** The proposal is contained in whole or in part in Documents W1364–W1373, W1891–W1950/W1953–W1995/W2005–W2036, W1996–W2004, W2888–W2912, 1628–1639, and 1657–1684.

**29.** These documents are W2511–W2540,

These documents appear to contain both actual compensation data as well as information about "confidential negotiations" between the government and AIG relating to executive compensation. (*Id.*).

The argument for the confidentiality of the actual compensation data apparently is that competitors who know exact compensation information would be able to poach AIG's employees by offering them higher salaries. (Decl. of Nicholas Kourides, dated June 19, 2009 (Docket No. 34) ("Kourides Decl."), ¶ 12).[30] AIG further contends that the negotiation information may "provide competitors with ammunition in their poaching efforts by allowing them to suggest what new restrictions may be coming in the future, even if the speculation is entirely inaccurate." (*Id.*).

Fox contends that Treasury's arguments are meritless because a competitor wishing to outbid AIG for an employee can simply contact the employee, determine how much they earn, and extend an offer of more money. Fox also notes that in two past cases in other circuits, courts have found similar arguments regarding compensation information unavailing. (*See* Fox Mem. at 38–39) (citing *News Grp. Boston v. Nat'l R.R. Passenger Corp.*, 799 F.Supp. 1264, 1269 (D.Mass.1992), and *Lykes Bros. S.S. Co. v. Pena*, Civ. A. No. 92–2780–TFH, 1993 WL 786964, at *7 (D.D.C. Sept. 2, 1993)).

When actual compensation information for individual employees is set forth in a document, Treasury has redacted the information pursuant to Exemption 6, not Exemption 5. Fox further represented at oral argument that it did not challenge the Exemption 6 redactions. (*See* 3/19/10 Tr. at 2–3). Accordingly, the actual individual compensation data need not be disclosed.

The final restrictions on compensation to which AIG agreed as part of the TARP transaction are publicly available to any of AIG's competitors. Although the General Counsel of AIG contends that "information about the compensation structure at AIG" would put competitors in a better position to "poach key employees," he has not specified what that "compensation structure" information is. (*See* Kourides Decl. ¶ 12).

 The documents that AIG seeks to withhold are primarily emails and transactional documents reflecting the negotiations between Treasury and AIG regarding compensation. Although Mr. Kourides contends that even inaccurate speculation about new compensation restrictions that had been proposed might harm AIG, this argument is entirely speculative. Neither Treasury nor AIG has explained how inaccurate (or even accurate) information would materially help competitors to poach employees. Perhaps AIG believes its competitors will scare its employees into jumping ship by speculating about future compensation restrictions. In the alternative,

---

W2567–W2569/W3097–W3099, W2614, W2714–W2717/W3152–W3155, W2729–W2736/W3100–W3107, W2737–W2739/W3108–W3110, W2740–W2745/W3111–W3116, W2746–W2748/W3117–W3119, W2749–2755/W3120–W3126, W2756–2757/W3127–W3128, W2774–W2783, W2811–W2814, 1279–1288, 1441–1551, 1736–1740, 1781–1794, 1795–1809, 1810–1848, 1849–1881, 2226–2230, 2231–2238, 2556–2592, 2628–2660, 2710–2716, 2731–2766, 2769–2777, 2794–2805, 2806–2811, 8414–8420, 8421–8428, 8432–8442, 8443–8460, 8461– 8470, 8472–8494, 8531–8534, 8563–8566, 8827–8828, and 8834–8836.

**30.** AIG also claims that because it is in the process of recalibrating salaries across the board, the disclosures could lead to internal discord. (Kourides Decl. ¶ 13). This, however, is not a factor appropriately considered under Exemption 4. *See, e.g., Pub. Citizen*, 704 F.2d at 1291 n. 30 (competitive harm flowing from employee disgruntlement is not cognizable under Exemption 4).

AIG may be concerned that its employees will flee to competitors after learning of draconian executive compensation provisions that had been proposed, but were not actually adopted. Treasury and AIG simply have not explained, however, how the release of the redacted information contained in these documents would likely result in the loss of key employees to AIG's competitors at this late date. Accordingly, Treasury must release these documents in full to Fox (except for the Exemption 6 redactions).[31]

### b. *Negotiation Positions*

 Treasury withholds many other documents at AIG's request because they allegedly reveal sensitive information which would put potential purchasers of AIG's assets in a stronger negotiating position vis-a-vis AIG.[32] (Kourides Decl. ¶¶ 9–10). Treasury argues that "[t]he more potential purchasers know about the negotiating points and disputes and terms of the agreements between AIG and the federal government" the better able they will be to drive a favorable bargain. (*Id.* ¶ 9). Fox counters that this scenario is both "counterintuitive and nonspecific," and questions how the history of AIG's negotiation with Treasury—"a unique transaction in which Treasury was the recipient of stock and the NYFRB was a secured lender on terms that could not be obtained from the marketplace"—could constitute

"transferable information of real use to a private bidder." (Fox Mem. at 37).[33]

As the December 4 Order noted, a generic statement that each document contains some sort of sensitive information which would harm AIG is insufficient to sustain Treasury's burden. Accordingly, I directed Treasury to "specify the type of sensitive information allegedly contained in each document, and how that particular information could be used to the competitive disadvantage of the person from whom the information was obtained." (December 4 Order at 7). In response, Treasury detailed the information that would be revealed by disclosure. For example, the Revised *Vaughn* Index for Document W2774–2783, added that "release [of the transactional draft document] would reveal changes to voting provisions and to repurchase rights provisions of agreement; email release would reveal what items remain open: compensation, board recommendation of shareholder vote, and transfer agent appointment." The revised entry for another document, W3215–W3241, added that "release would reveal factors outside advisors determined were important in valuing equity interest at AIG."

Despite these modifications, the Revised *Vaughn* Index does not adequately address how "particular information could be used to the competitive disadvantage of the person from whom the information was

---

31. Because it is not the content of these documents, but, rather, AIG's theory of why disclosure of them would result in competitive harm that is deficient, nothing would be gained by reviewing them *in camera*.

32. These documents are W2614, W2639–W2652, W2680–W2713, W2774–W2783, W3134–W3151, W3215–3241, 1279–1288, 1307T–1353, 1354–1440, 1441–1551, 1781–1794, 1795–1809, 1810–1848A, 1849–1881, 1896–1911, 2231–2237, 2306–2311, 2361–2420, a portion of 2527A–2542, 2556–2592, a

portion of 2628–2660, 2676–2684, 2710–2716, 2732–2766, 3306–3348, 3349–3438, 3438A–3494, 8498, 8611, 8741, portions of 8750–8758, 8785, 8788–8790, 8796–8804, 8837–8838, and 8997–9002.

33. Fox also argued that potential bidders were not "competitors" in the sense of the *National Parks*. (Fox Mem. at 37). Treasury has attempted to correct that problem by adding the words "including industry competitors" to its explanation of the potential harm in its Revised *Vaughn* Index.

obtained," as the December 4 Order required. Rather, Treasury simply added to each entry the boilerplate phrase that release "could potentially put purchasers of AIG businesses and assets, including industry competitors, in a stronger negotiating position." As Fox correctly observes, it also does not appear that Treasury obtained any additional information from AIG since the Revised *Vaughn* Index is not accompanied by any additional declarations from AIG officers or employees. In the absence of such supplementation, the description of the harm remains utterly speculative. For example, the Revised *Vaughn* Index does not explain how a discussion of the items remaining open at a particular stage in the negotiation, (*see* W2774–2783), would aid a potential purchaser of AIG's assets today.

Moreover, while AIG's argument might make sense if an entity were negotiating a series of similar contracts—and disclosure of the entity's pricing strategy or other guideposts might prove damaging—that is not the situation here. Instead, AIG and Treasury engaged in a unique transaction not typically available in the marketplace. The exposure of AIG's bottom line, *i.e.*, the favorable terms it gave Treasury, might be helpful to those seeking to purchase AIG assets, but those terms have already been made public through the release of the final transaction documents. AIG has not adequately explained how the disclosure of additional information, such as the details of the negotiations over the voting rights of the unique class of preferred stock created for this transaction, would put AIG at

a disadvantage in future negotiations with non-governmental entities.[34]

Accordingly, Treasury must release these documents in full to Fox.

### iv. *Citigroup*

Treasury relies on Exemption 4 on behalf of Citigroup with respect to three categories of documents: (a) fifteen "documents reflecting negotiations between Citigroup and Treasury ... concerning restrictions on executive compensation;" (b) four "documents reflecting information regarding individual Citigroup employees' waivers of rights relating to their personal compensation;" and (c) one "draft presentation provided by Citigroup to Treasury as an example of the type of finance/risk reporting Citigroup intended to prepare for government regulators." (Treasury Mem. at 46).

### a. *Compensation Negotiation Documents*

■■■ Citigroup asserts that release of documents reflecting its negotiations with Treasury will subject it to competitive harm by allowing competitors to see the "interim positions and concerns" that Citigroup articulated during negotiations, as well as particular provisions that were important to Citigroup.[35] (*Id.* at 47). As Paul McKinnon, Head of Human Resources for Citigroup explains.

> Disclosure of these sensitive negotiation documents would reveal to the public, including to other business entities that vigorously compete with Citigroup, confidential information concerning Citigroup's internal strategies, objectives

---

**34.** Documents assessing the true value of AIG's assets might be harmful to it in future transactions. Although some of the documents apparently contain information about factors important for valuing AIG's assets, Treasury and AIG have not argued that the documents contain actual confidential valuations of AIG assets.

**35.** These documents are 9512–9515, 9599–9602, a portion of 9623–9625/9640–9644, 9630–9639/9646, 9684–9697, a portion of 9729–9739/9743–9745/9754–9756/9757–9763, and 9816–9826.

**570**

and approaches regarding compensation of its senior executives. In particular, the successive drafts of proposed and counter-proposed contractual provisions reflected in these documents, as well as the related substantive discussions between Citigroup personnel and agency representatives about such provisions that occurred as negotiations evolved, reveal and highlight particular issues and policies regarding executive compensation, and limitations upon executive compensation, that Citigroup treated as significant and worthy of special attention during the negotiations.

(Decl. of Paul McKinnon, dated June 17, 2009 (Docket No. 35) ("McKinnon Decl."), at ¶ 7). Citigroup asserts that this view of its compensation strategies would give competitors an "unfair competitive edge," (*id.* ¶ 8), in the "fiercely competitive marketplace for senior executive talent." (Treasury Mem. at 47). Fox responds that Citigroup's assertions as to how release of the compensation information would harm Citigroup are "conspicuously non-specific." (Fox Mem. 40).

Although Citigroup uses different language (and more of it) than AIG, its arguments regarding the damage that would result if its executive compensation negotiations were disclosed are no less speculative. For example, its statements regarding an "unfair competitive edge" do not justify a finding that harm is "likely" to occur if this information is released. Citigroup also fails to explain adequately how competitors' insights into Citigroup's "strategies, objectives and approaches regarding compensation of its senior executives," beyond that which is already evident from the publicly-released final documents, would give its competitors an unfair advantage should Treasury release these documents in full to Fox.

The documents therefore must be released.

### b. *Individuals' Waivers*

 Citigroup similarly asserts that the release of documents pertaining to its executives' waivers of various rights would make it more difficult to recruit and retain executives because the release of the information concerning specific employees would "diminish Citigroup's relative attractiveness" as an employer.[36] (Treasury Mem. at 48; McKinnon Decl. ¶¶ 14–18).

To the extent that this concern is based on the Citigroup employees' individual privacy interests, Treasury has also objected pursuant to Exemption 6, and Fox has not objected. To the extent that Citigroup believes the release of documents related to waivers that do not identify individuals would be equally harmful, I note that it was Citigroup's need to accept governmental assistance that led to the public disclosure of Citigroup's compensation information. Therefore, unless Citigroup expects to require government funding again, there is no reason why its compensation information will become public in the future, and thus no reason why its potential recruits should fear the release of their compensation information to the public. Accordingly, I find that Citigroup has not established a likelihood of substantial competitive harm. These documents therefore must be released in full, except to the extent that individuals' names and other identifying information has been redacted pursuant to Exemption 6.

### c. *Draft Presentation*

 Document W3176–W3191, prepared in November or December 2008, is a presentation that Citigroup provided to Treasury—apparently as an exemplar of the finance/risk-reporting it proposed to provide to Treasury pursuant to the loss-sharing arrangement it entered into with

---

**36.** These documents are W3192, W3193, 9519–9521, 9576–9584, and 9617–9622.

Treasury in January 2009 as part of the AGP transaction. (*See* Decl. of Gregory D. Hawkins, dated June 17, 2009 (Docket No. 36) ("Hawkins Decl."), ¶ 3). Although the document was intended to serve as an illustration, it contains actual data from Citigroup's operations. (*Id.*). In its Revised Vaughn Index, Treasury contends this document "contains sensitive and confidential commercial information relating to Citigroup's financial position and operations as of late 2008, and would likely cause substantial competitive harm to Citigroup for the reasons described in paragraphs 4–6 of the Hawkins Declaration."

Citigroup argues that release of the Citigroup draft presentation would reveal information about "the composition of a Citigroup asset pool, its loan loss reserves, its risk classifications, its asset types, and the originating business and geographical location of those assets." (Hawkins Decl. ¶ 3). It further contends that this detailed information "would provide Citigroup's competitors with insights as to Citigroup's business, assets, and internal strategies for risk management that they could not glean from publicly available sources," and that this would "enhance [competitors'] ability to anticipate or predict Citigroup's future business plans, strategies and or activities, and thereby unfairly improve their capacity to compete against Citigroup." (*Id.* ¶ 5).

This document does not merely concern negotiations over terms that eventually were made public. Rather, it contains confidential, proprietary information about Citigroup assets, business plans, and risk management strategies. Citigroup therefore has demonstrated a sufficiently likely competitive injury. This document therefore was properly withheld.

## VII. *Conclusion*

For the foregoing reasons and as detailed in Appendix A, both Treasury's motion for summary judgment (Docket No. 22) and Fox's cross-motion for summary (Docket No. 43) judgment are granted in part and denied in part.

The Court will hold a telephone conference on September 13, 2010, at 11:00 a.m. to determine whether there are any further issues requiring resolution before this case is closed. Counsel for the plaintiff should initiate that call.

SO ORDERED.

## APPENDIX A

| DOCUMENT NUMBER | BASIS | DISPOSITION |
| --- | --- | --- |
| W0001–W0004 | Exemption 5 | proper |
| W0005–W0006/ W0174–W0175 | Exemption 5 | release in full |
| W0034–W0069 | Exemption 5 | proper |
| W0091–W0092 | Exemption 5 | proper |
| W0139–W0140 | Exemption 5 | release in full |
| W0169–W0171 | Exemption 5 | release in full |
| W0172–W0173 | Exemption 5 | proper |
| W0236–W0237 | Exemption 5 | release in full |
| W0238–W0269 | Exemption 5 | proper |
| W0270–W0271 | Exemption 5 | release in full |
| W0272 | Exemption 5 | proper |

| DOCUMENT NUMBER | BASIS | DISPOSITION |
| --- | --- | --- |
| W0327–W0328/ W1583–1584 | Exemption 5 | release in full |
| W0455–W0519 | Exemption 5 | proper |
| W0750–W0767 | Exemption 5 | proper |
| W0792–W0794 | Exemption 5 | release except for two paragraphs at top of W793 |
| W1051–W1054 | Exemption 5 | not challenged |
| W1364–W1373 | Exemption 4 | proper |
| W1439–W1536 | Exemption 5 | proper |
| W1755–W1800 | Exemption 5 | proper |
| W1856 | Exemption 5 | not challenged |

| DOCUMENT NUMBER | BASIS | DISPOSITION |
| --- | --- | --- |
| W1891–W1950/ W1953–W1995/ W2005–W2036 | Exemption 4 | proper |
| W1996–W2004 | Exemption 4 | proper |
| W2391–W2392 | Exemption 5 | proper |
| W2446 | Exemption 5 | non-responsive |
| W2497 | Exemption 5 | proper |
| W2511–W2540 | Exemption 4, Exemption 5 | proper as to Exemption 5; release as to Exemption 4 |
| W2567–W2569/ W3097–W3099 | Exemption 4, Exemption 6 | release in full except for Exemption 6 redactions |
| W2612–W2613 | Exemption 5 | proper |
| W2614 | Exemption 4 | release in full |
| W2639–W2652 | Exemption 4 | release in full |
| W2680–W2713 | Exemption 4 | release in full |
| W2714–W2717/ W3152–W3155 | Exemption 4, Exemption 5, Exemption 6 | release in full except for Exemption 6 redactions |
| W2719 | Exemption 5 | release in part (top email from Rutherford should be redacted; bottom email from Rowe–Straker should be released) |
| W2729–W2736/ W3100–W3107 | Exemption 4 | release in full |
| W2737–W2739/ W3108–W3110 | Exemption 4, Exemption 6 | release in full except for Exemption 6 redactions |
| W2740–W2745/ W3111–W3116 | Exemption 4 | release in full |
| W2746–W2748/ W3117–W3119 | Exemption 4 | release in full |
| W2749–W2755/ W3120–W3126 | Exemption 4, Exemption 6 | release in full except for Exemption 6 redactions |
| W2756–W2757/ W3127–W3128 | Exemption 4 | release in full |
| W2774–W2783 | Exemption 4 | release in full |
| W2791–W2793 | Exemption 5 | proper |
| W2799–W2803 | Exemption 5 | proper |
| W2811–W2814 | Exemption 4 | release in full |
| W2842 | Exemption 2 | not challenged |
| W2843 | Exemption 4 | proper |
| W2844–W2846 | Exemption 4 | proper |
| W2850–W2852 | Exemption 2 | not challenged |
| W2860 | Exemption 4 | proper |
| W2861 | Exemption 4 | proper |
| W2872–W2874 | Exemption 4 | release in full |
| W2875 | Exemption 4 | release in full |
| W2882 | Exemption 5 | release in full |
| W2883–W2885 | Exemption 2, Exemption 6 | not challenged |
| W2886–W2887 | Exemption 6 | not challenged |
| W2888–W2912 | Exemption 4 | proper |
| W2913–W2931 | Exemption 4, Exemption 5 | proper |
| W2932–W2933 | Exemption 4, Exemption 5 | proper |
| W2934–W2949 | Exemption 4, Exemption 5 | proper |
| W2950–W2955 | Exemption 4, Exemption 5 | proper |
| W2956–W2977 | Exemption 4, Exemption 5 | proper |
| W3044–W3045 | Exemption 6 | not challenged |
| W3046–W3048 | Exemption 5, Exemption 6 | proper |
| W3050–W3053 | Exemption 5 | proper |
| W3070–W3073 | Exemption 5 | proper |
| W3077–W3082 | Exemption 5 | proper |
| W3085–W3092 | Exemption 5 | proper |
| W3134–W3151 | Exemption 4 | release in full |
| W3176–W3191 | Exemption 4, Exemption 6 | proper |
| W3192 | Exemption 4, Exemption 6 | release in full except for Exemption 6 redactions |
| W3193 | Exemption 4, Exemption 6 | release in full except for Exemption 6 redactions |
| W3210–W3211/ W3212–W3213 | Exemption 4, Exemption 5 | proper |
| W3215–W3241 | Exemption 4 | release in full |
| W3254–3319 | Exemption 4, Exemption 5 | proper |
| W3323–W3356 | Exemption 4, Exemption 5, Exemption 6 | proper |
| W3357–W3358 | Exemption 4, Exemption 5 | proper |
| 1279–1288 | Exemption 4, Exemption 6 | release in full except for Exemption 6 redactions |
| 1289–1303 | Exemption 5 | proper |

| DOCUMENT NUMBER | BASIS | DISPOSITION |
|---|---|---|
| 1305–1306 | Exemption 2, Exemption 5 | release in full except for Exemption 2 redactions |
| 1307T–1353 | Exemption 4 | release in full |
| 1354–1440 | Exemption 4 | release in full |
| 1441–1551 | Exemption 4 | release in full |
| 1567–1579 | Exemption 5 | proper |
| 1628–1639 | Exemption 4 | proper |
| 1657–1684 | Exemption 4 | proper |
| 1685–1690 | Exemption 5 | proper |
| 1695–1696 | Exemption 5 | release in full |
| 1697–1697B | Exemption 5 | release in full |
| 1704–1706 | Exemption 5 | release in full |
| 1714–1717 | Exemption 5 | proper |
| 1733–1740 | Exemption 4, Exemption 5 | 1733–1735 proper; 1736–1740 should be released in full |
| 1741–1762 | Exemption 5 | proper |
| 1765–1780 | Exemption 5 | proper |
| 1781–1794 | Exemption 4 | release in full |
| 1795–1809 | Exemption 4 | release in full |
| 1810–1848 | Exemption 4 | release in full |
| 1849–1881 | Exemption 4 | release in full |
| 1882–1895 | Exemption 5 | proper |
| 1896–1911 | Exemption 4 | release in full |
| 1912–1913 | Exemption 5 | proper |
| 1914–1926 | Exemption 5 | proper |
| 1930–1931 | Exemption 5 | proper |
| 1932–1933 | Exemption 5 | proper |
| 1980–1985 | Exemption 2, Exemption 5 | release in full except for Exemption 2 exemptions |
| 1986–1999 | Exemption 5 | proper |
| 2013–2022 | Exemption 5 | proper |
| 2023–2033 | Exemption 5, Exemption 6 | proper |
| 2126–2127 | Exemption 2, Exemption 5 | release in full except for Exemption 2 exemptions |
| 2128–2140 | Exemption 5 | proper |
| 2150–2153 | Exemption 5 | |
| 2154–2154 | Exemption 5 | proper |
| 2155–2155 | Exemption 5, Exemption 6 | release in full except for Exemption 6 redactions |
| 2158–2158 | Exemption 5 | proper |
| 2159–2159 | Exemption 5 | proper |
| 2160–2161 | Exemption 5 | proper |

| DOCUMENT NUMBER | BASIS | DISPOSITION |
|---|---|---|
| 2162–2163 | Exemption 5 | proper |
| 2164–2165 | Exemption 5 | proper |
| 2168–2180 | Exemption 5 | proper |
| 2181–2182 | Exemption 5 | proper |
| 2183–2195 | Exemption 5 | proper |
| 2196–2208 | Exemption 2, Exemption 5 | proper |
| 2209–2210 | Exemption 5 | proper |
| 2211–2212 | Exemption 5 | proper |
| 2213–2214 | Exemption 5 | proper |
| 2218–2220 | Exemption 5 | proper |
| 2221–2221 | Exemption 5 | proper |
| 2222–2223 | Exemption 5 | proper |
| 2226–2230 | Exemption 4 | release in full |
| 2231–2238 | Exemption 4 | release in full |
| 2239–2287 | Exemption 5 | proper |
| 2290–2298 | Exemption 2, Exemption 5 | proper |
| 2299–2300 | Exemption 5 | proper |
| 2301–2304 | Exemption 5 | release in full |
| 2306–2311 | Exemption 4 | release in full |
| 2312–2315 | Exemption 5 | proper |
| 2316–2316 | Exemption 2 | not challenged |
| 2317–2337 | Exemption 2, Exemption 5 | proper |
| 2338–2350 | Exemption 5 | proper |
| 2354–2358 | Exemption 5 | proper |
| 2361–2420 | Exemption 4 | release in full |
| 2421–2436 | Exemption 5 | proper |
| 2451–2463 | Exemption 5 | proper |
| 2464–2466 | Exemption 5 | release in full |
| 2479–2480 | Exemption 5, Exemption 6 | proper |
| 2481–2527 | Exemption 5 | proper |
| 2527A–2542 | Exemption 4, Exemption 5 | proper as to Exemption 5; release as to Exemption |
| 2543–2545 | Exemption 2, Exemption 5 | proper |
| 2546–2547 | Exemption 5 | proper |

| DOCUMENT NUMBER | BASIS | DISPOSITION |
|---|---|---|
| 2551–2554 | Exemption 5 | proper |
| 2555–2555 | Exemption 5 | proper |
| 2556–2592 | Exemption 4 | release in full |
| 2593–2594 | Exemption 5 | proper |
| 2599–2607 | Exemption 5 | proper |
| 2616–2618 | Exemption 5 | proper |
| 2621–2622 | Exemption 5 | proper |
| 2626–2627 | Exemption 5 | proper |
| 2628–2660 | Exemption 4 | release in full |
| 2661–2663 | Exemption 5 | release in full |
| 2664–2666 | Exemption 5 | release in full |
| 2676–2684 | Exemption 4 | release in full |
| 2688–2703 | Exemption 5 | proper |
| 2704–2706 | Exemption 5 | proper |
| 2707–2708 | Exemption 5 | release in full |
| 2710–2716 | Exemption 4 | release in full |
| 2717–2717 | Exemption 5 | proper |
| 2727–2727 | Exemption 5 | proper |
| 2728–2730 | Exemption 5 | proper |
| 2731–2766 | Exemption 4, Exemption 5 | release in full |
| 2767–2768 | Exemption 5 | release in full |
| 2769–2777 | Exemption 4 | release in full |
| 2779–2793 | Exemption 5 | proper |
| 2794–2805 | Exemption 4, Exemption 5 | redactions on the top of 2794 pursuant to Exemption 5 are proper; the remaining redacted text shall be released |
| 2806–2811 | Exemption 4 | release in full |
| 2812–13 | Exemption 5 | proper |
| 2850–3032 | Exemption 5 | proper |
| 3035–3037 | Exemption 5 | proper |
| 3038–3045 | Exemption 5 | proper |
| 3236–3290 | Exemption 5 | proper |
| 3306–3348 | Exemption 4 | release in full |
| 3349–3438 | Exemption 4 | release in full |
| 3438A–3494 | Exemption 4 | release in full |
| 8391–8399 | Exemption 2, Exemption 5 | release in full except for Exemption 2 redactions |
| 8405–8405 | Exemption 5 | proper |
| 8414–8420 | Exemption 4 | release in full |
| 8421–8428 | Exemption 4 | release in full |
| 8432–8442 | Exemption 4, Exemption 6 | release in full |
| 8443–8460 | Exemption 4 | release in full |
| 8461–8470 | Exemption 4 | release in full |
| 8472–8494 | Exemption 4 | release in full |
| 8495–8497 | Exemption 5 | proper |
| 8498–8498 | Exemption 4 | release in full |
| 8499–8499 | Exemption 5 | proper |
| 8503–8506 | Exemption 5 | proper |
| 8507–8530 | Exemption 5 | proper |
| 8531–8534 | Exemption 4 | release in full |
| 8536–8537 | Exemption 5 | proper |
| 8540–8542 | Exemption 5 | proper |
| 8548–8550 | Exemption 5 | proper except for redaction in email from Nowak to Albrecht at top of 8548 |
| 8551–8552 | Exemption 5 | proper |
| 8563–8566 | Exemption 4 | release in full |
| 8567–8569 | Exemption 5 | proper except for redaction in email from Nowak to Albrecht at the middle of 8567 (same redaction as top of 8548) |
| 8572–8583 | Exemption 5 | proper |
| 8591–8598 | Exemption 5 | proper |
| 8594–8595 | Exemption 5 | proper |
| 8596–8601 | Exemption 5 | proper |
| 8611–8611 | Exemption 4, Exemption 5 | proper pursuant to Exemption 5; release as to Exemption 4 redactions |
| 8614–8614 | Exemption 5 | release in full |
| 8615–8618 | Exemption 5 | proper |
| 8619–8629 | Exemption 5 | proper |
| 8630–8635 | Exemption 5 | proper |
| 8687–8690 | Exemption 5 | proper |
| 8691–8693 | Exemption 5 | proper |
| 8694–8697 | Exemption 5 | release in full |
| 8698–8701 | Exemption 5 | proper |
| 8704–8706 | Exemption 5 | proper |
| 8713–8713 | Exemption 5 | proper |
| 8714–8717 | Exemption 5 | proper |

| DOCUMENT NUMBER | BASIS | DISPOSITION |
|---|---|---|
| 8718–8718 | Exemption 5 | proper |
| 8726–8734 | Exemption 5 | proper |
| 8741–8741 | Exemption 4 | release in full |
| 8742–8746 | Exemption 5 | proper |
| 8750–8758 | Exemption 4, Exemption 5 | email from Albrecht proper pursuant to Exemption 5; release as to other Exemption 5 redactions and all Exemption 4 redactions |
| 8781–8784 | Exemption 5 | proper |
| 8785–8785 | Exemption 4 | release in full |
| 8788–8790 | Exemption 4 | release in full |
| 8791–8795 | Exemption 5 | proper |
| 8796–8804 | Exemption 4 | release in full |
| 8807–8811 | Exemption 5 | proper |
| 8812–8817 | Exemption 5 | proper |
| 8825–8826 | Exemption 5 | proper |
| 8827–8828 | Exemption 4 | release in full |
| 8829–8830 | Exemption 5 | proper |
| 8831–8833 | Exemption 5 | proper except for Q & A email on 8831 |
| 8834–8836 | Exemption 4 | release in full |
| 8837–8838 | Exemption 4 | release in full |
| 8861–8864 | Exemption 5 | proper |
| 8875–8881/ 8883–8889 | Exemption 5 | proper |
| 8894–8896 | Exemption 5 | release in full |
| 8904–8916 | Exemption 5 | proper |
| 8917–8929 | Exemption 5 | proper |
| 8930–8933 | Exemption 5 | proper |
| 8934–8946 | Exemption 5 | proper |
| 8947–8959 | Exemption 5 | proper |
| 8960–8961 | Exemption 5 | proper |
| 8962–8964 | Exemption 5 | proper |
| 8972–8983 | Exemption 5 | proper except for second email on 8979 (from NYFRB to Treasury) and email on 8982 (same) |
| 8995–8996 | Exemption 5, Exemption 6 | proper |
| 8997–9002 | Exemption 4 | release in full |
| 9003–9004 | Exemption 5 | release in full |
| 9005–9005 | Exemption 5 | release in full |
| 9047–9051/ 9055–9062 | Exemption 5 | proper |
| 9052–9054 | Exemption 2, Exemption 5 | proper |

| DOCUMENT NUMBER | BASIS | DISPOSITION |
|---|---|---|
| 9064–9064 | Exemption 5 | proper |
| 9065/ 9066–9067 | Exemption 5 | proper |
| 9068–9069 | Exemption 5 | proper |
| 9073–9081 | Exemption 5 | proper |
| 9083–9085 | Exemption 5 | proper |
| 9152–9161 | Exemption 5 | proper |
| 9162–9243 | Exemption 5 | proper |
| 9244–9257 | Exemption 5 | proper |
| 9300–9340 | Exemption 5 | proper |
| 9341–9346 | Exemption 5 | release except for 3rd and 4th sentences of email from Albrecht to Hennessy, et al. on 9341 (repeated on 9344) |
| 9349–9362 | Exemption 5 | proper |
| 9464–9487/ 9501–9505 | Exemption 2, Exemption 5 | proper |
| 9512–9515 | Exemption 4 | release in full |
| 9519–21 | Exemption 4 | release in full |
| 9525–9537/ 9542–9549 | Exemption 2, Exemption 5 | proper |
| 9538–9541/ 9551–58 | Exemption 2 | not challenged |
| 9559–9575 | Exemption 5 | proper |
| 9576–9584 | Exemption 4, Exemption 5 | proper |
| 9585–9585 | Exemption 5 | proper |
| 9587–9596 | Exemption 5 | proper |
| 9597–98/ 9615–16 | Exemption 5 | proper |
| 9599–9602 | Exemption 4 | release in full |
| 9604–9612 | Exemption 5 | proper |
| 9617–9622 | Exemption 4, Exemption 5 | proper |
| 9623–9625/ 9640–9644 | Exemption 4, Exemption 5 | Exemption 5 redactions on 9624 and 9642 proper; release remaining redacted text |
| 9630–9639/ 9646 | Exemption 4 | release in full |
| 9647–9648 | Exemption 5 | proper |
| 9674–9683 | Exemption 5 | proper |
| 9684–9697 | Exemption 4 | release in full |
| 9698–9698 | Exemption 5 | proper |
| 9699–9725 | Exemption 5 | proper |

| DOCUMENT NUMBER | BASIS | DISPOSITION |
|---|---|---|
| 9726–28 | Exemption 5 | proper |
| 9729–9739/ 9743–9745/ 9754–9756/ 9757–9763 | Exemption 2, Exemption 4, Exemption 5 | proper as to Exemption 2 and Exemption 5; release as to Exemption 4 |
| 9795–9815 | Exemption 5 | proper |
| 9816–9826 | Exemption 4 | release in full |

| DOCUMENT NUMBER | BASIS | DISPOSITION |
|---|---|---|
| 9831–9834 | Exemption 5 | proper |
| 9971–9977 | Exemption 5 | proper |
| 9978–9978 | Exemption 5 | proper |
| 10091– 10093 | Exemption 2, Exemption 4, Exemption 5 | proper except for Exemption 5 redactions on 10091 |